**TIME, INC., d/b/a Life, Appellant,**

v.

**Michael J. McLANEY, a/k/a Mike McLaney, Appellee.**

**No. 25585.**

United States Court of Appeals
Fifth Circuit.

Jan. 3, 1969.

Rehearing En Banc Denied
Feb. 11, 1969.

Harold R. Medina, Jr., New York City, Wm. S. Frates, Miami, Fla., for appellant, Larry S. Stewart, Frates, Fay, Floyd & Pearson, Miami, Fla., V. Thomas Fryman, Jr., Cravath, Swaine & Moore, New York City, of counsel.

Robert Orseck, J. B. Spence, Ronald S. Golub, Miami, Fla., for appellee, Podhurst

& Orseck, Spence, Payne & Mastington, Miami, Fla., of counsel.

Before JOHN R. BROWN, Chief Judge, TUTTLE, Circuit Judge, and FISHER, District Judge.

TUTTLE, Circuit Judge:

We are here presented with an unusual appeal, since it has heretofore hardly ever fallen to the lot of this court to consider an appeal from the *denial* by the trial court of a motion for summary judgment. Prior to the adoption by the Congress of the 1958 Amendment to 28 U.S.C.A. § 1292, by adding Section (b), no appeal could be taken from such an order by the trial court because it was not a "final order." Now, however, this court has jurisdiction to entertain such an appeal when the provisions of Section (b) are complied with.[1]

Here the trial court made the required certificate and this court, on December 7, 1967, entered its order granting the application provided for under Section 1292(b).

At the outset, it may be appropriate to sound a caveat with respect to the action taken by this court in granting the application for interlocutory appeal, lest every unsuccessful litigant in the trial court should consider this action as a precedent requiring or even suggesting the advisability of seeking such an interlocutory appeal upon the *denial* by the trial court of his motion for summary judgment. The subject matter of this litigation, involving, as it does, the very serious and timely question of how far the First Amendment guarantee of freedom of the press may still be impinged upon by actions for libel, places some cases in a somewhat different category.

This follows when the trial court and this court jointly consider that the failure to dismiss a libel suit might necessitate long and expensive trial proceedings, which, if not really warranted, would themselves offend the principles enunciated in Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22, because of the chilling effect of such litigation.

In this suit, in which the plaintiff demands a recovery of one million dollars actual and five million dollars punitive damages, and in which the plaintiff established a substantial record by taking depositions from several alleged sources of information relied upon by the publisher of the offending article, this court concluded that it would be appropriate to grant the request for an interlocutory appeal. This is appropriate because the Supreme Court has heretofore resolved, at the appellate level, in a number of cases, the question whether facts alleged and proved in the trial court met the standard laid down by it as to what nature of public official or public action would withdraw from a complaining party protection of the libel laws of the state absent a showing of "actual malice," and has also decided as a matter of law whether proof actually made upon the trial met that standard. See New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686, 95 A.L.R.2d 1412; Associated Press v. Walker, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (considered by the Supreme Court in connection with the cited case of Curtis Publishing Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094, and St. Amant v. Thompson, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262.[2]

---

1. 28 U.S.C.A. § 1292(b): "When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion, and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing such order. The Court of Appeals may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order: provided, however, that application for an appeal hereunder shall not stay proceedings in the district court unless the district judge or the Court of Appeals, or a judge thereof, shall so order."

2. In the St. Amant case the trial court set aside that part of the jury verdict based on a claim for punitive damages, on the

We conclude, therefore, that there are before us two questions for consideration: (1) Do the constitutional guarantees of the First and Fourteenth Amendments deny recovery to the plaintiff in this case unless he can show that the appellant published statements about him with "actual malice"? (2) If so, does the record established by the plaintiff demonstrate that there is no issue of fact from which the jury could find "actual malice"?

In order to understand the-basis for the plaintiff's claim of injury at the hands of the appellant, it is necessary to relate briefly the facts surrounding the publication of the article. We avoid repeating part of the factual recitation by dealing with the above two questions in reverse order.

The issue of Life Magazine for February 3, 1967, contained a fifteen-page article entitled "The Scandal in the Bahamas." The article was written by William Lambert and Richard Oulahan, but so far as this record is concerned the responsibility for its preparation falls on Lambert. The record discloses that Lambert was an associate editor of Life and a winner of the Pulitzer Prize for investigative reporting. He had started work on the article in the early fall of 1966. In connection with its preparation he called on the press officer of the Department of Justice, who referred him to a lawyer, Robert Peloquin, a member of the Organized Crime and Racketeering Section of the Department of Justice. During the course of this discussion, Peloquin told Lambert that gamblers who had formerly operated in Havana under the Batista regime had moved to the Bahamas. Included in the names mentioned by Peloquin was that of Mike McLaney. Peloquin stated that McLaney was "one of the Havana gamblers who had moved into the Bahamas at one time or another, and he was mentioned as having operated a casino at Cat Cay, and that was his [sic]—it was brushed over. It was rela-

tively unimportant." Lambert made no notes of this conversation, and in the original writing of the article he made✓ no mention of McLaney. However, he devoted a good deal of the article to discussing the influx of U. S. gangsters, paying particular attention to the activities of three men, Courtney, Ritter and Brudner, who were described as "three Lansky henchmen." Immediately preceding the paragraph that mentions the plaintiff the single time, is this language:

"Courtney, Ritter and Brudner are all fugitives from the United States justice under indictment for violating the federal anti-racketeering statute as well as gambling tax evasion and failure to buy the annual $50 gambling stamp (they once operated the nation's largest bookie network, inherited from the late Frank Erickson)."

Then there follows the paragraph which is the subject matter of the lawsuit:

"Whatever the Pindling government decides to do about these three gamblers, one of their colleagues has turned up in the midst of Pindling's party. He is Mike McLaney, who managed one of Havana's big casinoes in the days when Lansky was a top mobster in the Cuban capital. During the recent election campaign, McLaney showed up in the Out Islands, providing free airlifts for PLP candidates. The mob always tried to hedge its bets."

The thrust of the article was that with connivance of the officials, the Bahaman government was actually a puppet government controlled by the United Bahamian Party (UBP). It described Sir Stafford Sands as the principal power in UBP. It developed the thesis that Sands arranged for the development of Grand Bahama Island through the Grand Bahama Port Authority, Ltd., headed by Wallace Groves. According to the article gambling was introduced to boost tourism, and Lansky and his "mobsters" arrived

ground that punitive damages could be awarded only where "malice" had been proved. Thus the trial court excluded the

issue of malice, based on the proof introduced to the jury.

with the acquiescence of Sands, Groves and the UBP.

The article then described the current election that ended January 10, 1967, by the election of Lynden Pindling, head of the predominantly Negro Progressive Liberal Party (PLP), as premier of the Bahamas and the rejection of Sands and the UBP. The article commented on the fact that in his campaign Pindling had made the presence of the gambling mob, notably Lansky's lieutenants, Courtney, Ritter and Brudner, his basis for attacking the existing government and its allies. The Life article described the Pindling campaign as an effort to rid the Bahamas of the Havana gambling group.

Lambert's article was practically completed at the time of the election on January 10th, at which time, either a day or two before the election, or a day or two following it, (the two participants to the conversation disagree as to the time) a public relations man named McCrary, from whom Lambert had obtained some earlier reports about conditions in the Bahamas, called, according to Lambert's deposition, or was called and responded, with the information that McLaney had lent helicopters to Out Island candidates (Lambert's testimony identified these as candidates for the PLP party). McCrary also testified that in a telephone conversation, a man named Joe Abrell, told him that a man named Probinski had introduced the new Prime Minister Pindling to McLaney. In his testimony McCrary emphasized: "All of this [was] hearsay and during this period it was my purpose to run down rumors." He also testified that he reported to Lambert that he had heard a rumored story around town that McLaney had introduced Lansky to Groves and another that McLaney introduced Lansky to Sands.[3]

Lambert testified that upon receiving the report from McCrary that McLaney was assisting in the Pindling campaign, he recalled having previously heard McLaney's name as a Havana gambling operator and he searched the Life Morgue

---

3. Since it is clear that the paragraph relating to McLaney originated entirely with McCrary's statement that McLaney was lending helicopters to assist in the Pindling campaign, the entire passage from his deposition relating to a possible connection between Lansky and McLaney is as follows:

"Q. Did you tell Mr. Lambert that Mr. McLaney introduced Lansky and Groves?

A. It was the story around. A story was spread around that presumably Sands and Bidwell (phonetically)—that Bidwell was Sands' man. A public relations guy for the Sands' party, whatever it was, U.B.P., or whatever it was. Among the stories was the fact that Mr. McLaney was working, and I was working for Chesler, going to bring Chesler back into power. That story was printed in the Miami Herald.

Q. Is it your testimony that a story appeared in the Miami Herald linking your name, Mr. McLaney's name and Chesler?

A. Yes, that is why I was in the campaign.

Q. Did you see the article yourself?

A. Yes, I was there. I got the clipping. The other story was that I had brought—you see, Lansky was even linked in everybody's mind with Courtney, Ritter and Bidwell,—and that I had brought Lansky to Groves. In the course of conversation with Mr. Lambert, the Groves name came in. Whether or not it was—wait a minute, you asked a specific question. Did I say that Mr. McLaney brought Mr. Lansky to Groves, or Sands?

Q. I said Groves.

A. I did not. I said that there was a story but the other story that I heard was that Mr. McLaney had come in with Lansky to see Sands long before Groves took up gambling.

Q. Mr. McCrary—

A. And Lansky had come in to see Sands. That is the story.

Q. It is your testimony that you heard a rumored story around town that Mr. McLaney was the one that introduced Lansky and Groves?

A. That was one story. The other was that Mr. McLaney introduced Lansky to Sands. Steve Barber confirmed Lansky came in with Sands too. Along with the whole Havana crowd.

Q. Did you report this to Mr. Lambert that this was something you heard rather than your own words?

A. Definitely. I would have no knowledge."

and checked information to ascertain whether this would disclose any connection between McLaney and other gamblers. Having found several articles that identified McLaney as being active in Havana gambling at the time Lansky was described as practically the partner of Batista in controlling gambling, he thereupon undertook to check with the Department of Justice again. He telephoned Mr. Peloquin and found that he was away from his office on naval training. He got the call through to him at a distant point where he asked him, "McLaney has come into this election campaign. I remember you mentioned his name. What can you tell me about him?" He testified that Peloquin said: "Well, it is coming off the top of my head, because I have no notes or information here with me." Peloquin then told him about McLaney being the manager for the Cat Cay Casino that belonged to an estate. Lambert testified that Peloquin gave him other information about his age, and his notes showed that he was a golf "prof," and then his notes showed "lightweight." In his testimony Lambert reconstructed this as Peloquin's having said, "He is a professional golfer, and that he was a golf hustler," and that he said, "He makes his living by his wits and he is a gambler," adding that "he is a lightweight." In his testimony, subsequently taken, Peloquin did not remember making any comments about McLaney's being a professional golfer or a golf hustler. However, he did testify twice that the notes, copies of which had been sent to him prior to his deposition, "are relatively accurate as to the information I had as to McLaney."

Lambert stated that Peloquin then suggested that he discuss the matter with United States Attorney Morganthau and Executive Assistant Gaynor, in the Southern District of New York.

Thereupon Lambert called Mr. Morganthau, who, aside from stating that he knew of McLaney in connection with the Carrousel Casino in Las Vegas, was unable to do more than suggest that he call Mr. Gaynor.

Although Lambert's notes indicated that he obtained some additional information from Gaynor, including for the first time, mention of an association between McLaney and Carroll Rosenblum, the only undisputed testimony, since Gaynor did not recall these facts, is Gaynor's answer, "What I testify to, and my best recollection is that he asked me about the Nacional in Havana, and I replied to him that I had read things about that, and that could be checked very easily by newspaper morgue clippings and things of that sort."

Lambert testified that during the course of these inquiries he had read the morgue references to McLaney and the Nacional.[4]

Life's folder also included numerous articles which discussed Lansky's dominant position in control of gambling in Havana during this corresponding period of time.[5]

---

4. In the morgue were the following: A New York Times story which described McLaney as "The owner of a casino at the Nacional Hotel in Havana"; another article from the New York Times in which he was called "a former Havana casino owner"; a further story in the folder from the Times in which McLaney was described as the "operator of the casino of the Nacional Hotel." These three articles appeared between March 14 and March 24, 1959. There was also a May 4, 1963 clipping from the Washington Post, written by a well known columnist, in which McLaney was referred to as "an American gambler who ran a casino in Havana and stayed on for 18 months after Castro's takeover."

5. Lambert commented particularly on statements from the morgue file, including the following:
"No American gambler, gangster or racketeer now can work in Havana without Lansky's OK." (N. Y. World-Telegram, Jan. 9, 1958; R. 69, 263.)
"Government supervision goes for all the games as they are being run under the partnership that racketeer Lansky has negotiated with Batista. Regular

Thus the record appears to be undisputed that at the time the paragraph dealing with McLaney was written, substantial investigation had been made into the question whether McLaney was a professional gambler who had operated in Havana, Cuba, at a time when numerous press reports agreed that such an operation in the Cuban capital could be carried on only with the agreement or protection of Lansky.

Thereupon, Lambert sought to check out McCrary's statement to him that McLaney had helped in the Pindling election. This he did by calling the new Prime Minister direct. The latter confirmed the fact that McLaney had made transportation available to the candidates in the "Out Islands," running as PLP candidates. Lambert testified that after completing this investigation he added the paragraph concerning McLaney to the article.

There is no suggestion that Lambert knew of any fact or circumstance which would cause him to doubt the truth of the statements made by him. Much is made by the appellee of the fact that, in his deposition, McCrary stressed the fact that much of what he told Lambert was hearsay—that is to say, rumors that he had heard around the Bahamas. This included the rumor, repeated by McCrary to Lambert, that McLaney was boasting in the bars of the Bahamas that he was going to take over the gambling business when the new government ousted the three Lansky henchmen.[6]

We are not here dealing with the correctness of all of the statements made in the paragraph complained of. We are concerned with the means by which Lambert obtained the basis for the statements, and, if required by the standard set down by the Supreme Court, the efforts he made to check the information. Finally, we must determine whether it is permissible for this court to conclude, as a matter of law, whether there was any fact put in issue on the record in the

police are assigned to 24-hour duty at all the big gaming casinos and secret police frequently mingle with the guests.

\* \* \* \* \*

But any number of other gamblers and bookmakers are around, including Frank Ritter and Max Courtney, who have long records, operating without interference from anyone. Courtney and Ritter, working with a New York attorney, have made several bids to get a piece of gambling at the Havana Hilton.

The Cuban government shows no sign of being aware of, much less disturbed by, the presence of the American mobsters on the Havana scene. And the prospect is that so long as Meyer Lansky, who is becoming the most feared racketeer in the U.S., remains a virtual partner of Dictator Batista in the gambling racket there will be no change.' (N. Y. Daily News, Jan.1968; R. 72, 264–65.)"

" \* \* \* No one could operate unless approved by Lansky, who has been a partner of Frank Erickson, Frank Costello, and 'Dandy Phil' Kastel, and knows his gambling fraternity.' (N. Y. Journal American, Feb. 21, 1958; R. 77, 267–68).

"All concessions to operate in Cuba had to have the OK of Lansky.' (N. Y.

Journal American, Feb. 21, 1958; R. 78, 268.)"

" \* \* \* None of the mob would make a move without talking it over with Miami's Meyer Lansky, 57, gangland boss of the southeastern U.S. and board chairman of the whole Havana show.' (Time, Mar. 2, 1959; R. 86, 270–71.)"

6. Lambert testified that this was stated to him by McCrary but that when he first heard it he gave no significance to it because it had come to him from an English newspaperman who had picked it up second hand. However, he testified that when he made his call to Prime Minister-Elect Pindling, he specifically put the question to him (presumably, he meant whether there was an agreement that McLaney was to take over the gambling under the new government) and Pindling answered, "Well, no, McLaney—we don't have any"—he said McLaney has just been helpful, and I don't know any of these things. He never did actually say —he didn't give me a flat denial about McLaney being involved. He did say that—the implication was that he had made no such arrangements and he didn't deny it.

"I didn't press it. I didn't think it was material." No statement to this effect was used in the article.

trial court which would require submission to a jury the question whether the plaintiff had carried his burden of showing not only the falsity of the statement, but, if false, that it was motivated by "actual malice," as defined by the recent Supreme Court decisions.

As we have shown, the record is undisputed that Lambert had ample justification for whatever statements were made to the effect that Meyer Lansky was head of a "mob" of gamblers in Havana; that this was with the connivance of dictator Batista, and that no one could carry on a major gambling operation in Havana without the consent of Lansky; that Ritter and Courtney and Brudner were operating openly in Havana at this time. It is equally clear that there was ample information available to Lambert to warrant his statement that McLaney was, at a time during and after the Batista regime, either the owner or operator of the casino at the Hotel Nacional. We attach no significance to the use of the word "ran," which Lambert explains was a compromise between what he had found in the newspaper clippings saying in the one place that McLaney was "owner" and in another that he was "operator."

Moreover, Lambert testified that in an inquiry made to the Department of Justice lawyer Peloquin in the early fall of 1966, the latter told him that this organized gamblers group had moved from Havana to the Bahamas, and he named McLaney as one of these gamblers.[7]

Also, appellee emphasizes the differences between Lambert's testimony and McCrary's recollection of what was said on the occasion of McCrary's informing Lambert of McLaney's assistance given to the Pindling party in the election. These differences are irrelevant to the consideration before us now. The information furnished by McCrary relevant to the present inquiry included: (1) the basic fact that McLaney had injected himself into the election of the new govment which was committed to put an end to the control of the gambling fraternity over governmental affairs in the Bahamas; (2) at a time when the records disclosed, without reference to whatever McCrary may have said, McLaney himself was a gambler, both as an individual and as an operator; (4) who had been operating a substantial gambling establishment in Cuba at a time when, according to reliable newspaper reports, such activity required such a person to be in league, directly or indirectly, with the overlord of all gambling, Meyer Lansky.

Drawing a conclusion therefrom that such a person was a "colleague" of the other three Havana gamblers, clearly identified as Lansky henchmen, required no further checking or verification, since "colleague" is merely a conclusionary word drawn from the basic facts which had been subjected to investigation.

As we have previously stated, courts, federal courts in particular, are reluctant to deprive a litigant of the opportunity to present his case to a jury. Particularly under the Federal Constitution are the courts denied the right to do so if there be a disputed issue of fact, which, if found in favor of the losing party, would entitle him to have a verdict by the jury sustained. Where,

---

7. In appellee's brief here, this personal conversation with Peloquin is ignored. It is implied, rather, that the sole source of Lambert's information from Peloquin was the telephone call made to him in January of 1967, after having learned from McCrary of McLaney's activity in the election campaign. Appellant's counsel, in cross-examining Lambert as to his telephone conversation with Peloquin, sought to show that Peloquin did not discuss the removal of the gambling mob to the Bahamas nor that the word "mob" was ever used or that Lambert asked him whether or not McLaney was a Lansky associate. The point of the matter is this does not create any dispute of fact between Lambert's testimony and that of Peloquin, because Lambert's testimony about Peloquin having told of McLaney being a gambler in Havana and having moved to the Bahamas related to a conversation with Peloquin several months earlier, as to which no inquiry was made of him when his deposition was taken.

however, it is plain that the record has been fully developed by depositions and affidavits on a motion for summary judgment, and such record demonstrates that, construing all of the facts and inferences to be drawn therefrom in favor of the party against whom the judgment is entered, he would not be entitled to have a jury verdict stand, we have not hesitated to hold that the grant of summary judgment is proper.

■ What, then, is the standard against which the facts of this case must be tested? The basic rule, denying full protection of the state libel laws because limited by the First Amendment, was set forth in New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686, 95 A.L.R.2d 1412. This court in New York Times Co. v. Connor (5th Cir., 1966) 365 F.2d 567, discussed the Sullivan Rule:

"This case is admittedly governed by the legal standards enunciated in the recent Supreme Court case of New York Times Co. v. Sullivan, 1964, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed. 686 [95 A.L.R.2d 1412] since Connor is clearly a public official. As such, he is prohibited 'from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with "actual malice"—that is, with knowledge that it was false or with reckless disregard of whether it was false or not.' Id. at 279, 84 S.Ct. at 726, 11 L. Ed.2d at 706. The showing of malice may not be 'presumed but is a matter for proof by the plaintiff * * *. [S]ince the question is one of alleged trespass across 'the line between speech unconditionally guaranteed and speech which may legitimately be regulated' * * * we [must] 'examine for ourselves the statements in issue and the circumstances under which they were made to see * * * whether they are of a character which the principles of the First Amendment, as adopted by the Due Process Clause of the Fourteenth Amendment, protect.' The court concluded that 'the proof present-ed to show actual malice lacks the convincing clarity which the constitutional standard demands * * *,' and reversed the libel conviction. Id. at 284–286, 84 S.Ct. at 728–729, 11 L. Ed.2d at 709–710. Additional explanation of the actual malice standard is found in Garrison v. Louisiana, 1964, 379 U.S. 64, 74–79, 85 S.Ct. 209, 216–218, 13 L.Ed.2d 125, 132–135 in which the Court stated that: (emphasis added.)

'* * * since "* * * erroneous statement is inevitable in free debate, and * * * it must be protected if the freedoms of expression are to have the 'breathing space' that they 'need * * * to survive' * * *," only those false statements made with the high degree of awareness of their probable falsity demanded by New York Times may be subject of either civil or criminal sanctions.'

* * * * * *

'The test which we laid down in New York Times is not keyed to ordinary care; defeasance of the privilege is conditioned, not on mere negligence, but on reckless disregard for the truth.' "

The standard was later enunciated in Time, Inc. v. Hill, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 and then in Curtis Publishing Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094; St. Amant v. Thompson, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262, and finally in Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811.

■ While the principle has been stated somewhat differently by majority, concurring and dissenting opinions, we note that throughout, as stated in the opinion in St. Amant, supra, "There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." 390 U.S. 727, 731, 88 S.Ct. 1323, 1325.

■ So, too, the Supreme Court, in the Sullivan case, determined for itself

that there was no issue of malice to be submitted to the jury. Being guided by the same test, we note that in this case there is a complete absence of any indication that the writer of the article had any suspicion of the falsity of the statements made by him, and there is a total lack of proof that he had before him any contra-indications as to the correctness of his conclusions. Thus, we answer the second question by deciding that this record, fully developed by affidavits and depositions taken at the instance of the plaintiff, demonstrated that no proof was adduced that had "the convincing clarity which the constitutional standard demands." New York Times Co. v. Sullivan, supra, 376 U.S. at 286, 84 S.Ct. at 729.

We come next to the first question: "Do the established facts make applicable this standard of actual malice?"

The cases already cited make clear that the thrust at state libel laws is proper in other varying situations in which matters of great public interest are involved. In Walker and Butts, supra, the standard of New York Times was applied to "public figures", and in Hill, supra, to suits for invasion of privacy based on false statements where a "matter of public interest is involved." Furthermore, we agree with the Court of Appeals for the Ninth Circuit which in its recent case, United Medical Laboratories, Inc. v. Columbia Broadcasting System, Inc., et al. (9th Cir.) D.C., 404 F.2d 706, November 18, 1968, said: "The standard of New York Times was not to be regarded as having had 'its outer limits * * * marked out' so as not to be open to further definition."

We conclude that the constitutional privilege extends to discussions by specific individuals, not associated with any government, if those individuals are involved in matters of important public concern. Such was the case of

the plaintiff here. He had injected himself into an election campaign in a small foreign country in which the announced policy of the opposition to the present government was the elimination of racketeer gambling. He had supported the effort of this reform government by contributing substantial material aid,[8] and thus lent a direct influence to the election of a national government for the country. Such activities as he engaged in, and his conduct as such a participant, are the proper subject of inquiry and of public interest. It seems clear, that he, as much as General Walker in the Walker case, supra, acted in a manner that amounted to a "thrusting of his personality into the 'vortex' of an important public controversy."

We conclude, therefore, that the defendant was entitled to a summary judgment because, following a motion for such judgment, and after proof was taken to show, if possible, the existence of malice, the record is silent as to any facts which would permit a fact finder to conclude that the standard laid down by the Supreme Court had been met by the plaintiff.

The judgment denying motion for summary judgment is reversed and the case is remanded to the district court with directions that a summary judgment for the defendant be entered.

## ON PETITION FOR REHEARING EN BANC

PER CURIAM:

The Petition for Rehearing is DENIED and the Court having been polled at the request of one of the members of the Court and a majority of the Circuit Judges who are in regular active service not having voted in favor of it, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is also DENIED.

---

8. Varying values are stated by different persons as to the cost of the helicopter rentals incurred by McLaney. The amounts varied from $25,000 to $100,000. The figure of approximately $60,000 seems well established.