**Vial J. BLANKE, Sr., Plaintiff,**

v.

**TIME, INC., Defendant.**
**Civ. A. No. 67–1578–C.**

United States District Court
E. D. Louisiana,
New Orleans Division.
Jan. 6, 1970.

Nathan Greenberg, Gretna, La., for plaintiff.

Cicero C. Sessions, Robert E. Winn, New Orleans, La., Harold R. Medina, Jr., New York City, for defendant.

RUBIN, District Judge.

■ Mindful of the repeated admonition of the Fifth Circuit Court of Appeals that the labors in attempting to resolve a lawsuit by summary judgment may be Sisyphean, a district court faced with a motion that suggests this apparent short cut to decision must scrutinize the material facts carefully to determine whether they present any genuine issues that must be resolved by the jury requested by the plaintiff. Since the jury is the trier of fact, there is no role for it to play when there is no real dispute with respect to any of the facts that might be material in reaching a decision. But the fundamental postulate of court administration under the Federal Rules—that the judge, however active a participant, must not usurp the jury's functions and deny a litigant the day in a jury's court promised him by the Constitution—must be kept in mind even when compelling constitutional interests are urged to defeat the suitor's claim. For it is trial by jury that is guaranteed by the Constitution, not trial by affidavit.

■■ This is a suit for damages resulting from the alleged defamation of the plaintiff by Life Magazine. Defendant, asserting its qualified privilege under the First Amendment, has moved for summary judgment. The controlling legal principle that has evolved in the five years since New York Times Co. v. Sullivan, 1964, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686, is already clear: where a publisher deals with matters of legitimate public concern, the First Amendment shields him from claims for libel unless he not only publishes false material but does so with knowledge of its falsity or with reckless disregard for its truth or falsity.[1]

The *Sullivan* doctrine, as it has been elucidated in the later cases, is that the constitutional regard for uninhibited discussion of public affairs supersedes, to an extent, state interest in protecting private reputations or in forestalling conflict among individuals.[2] Therefore, in cases where the *Sullivan* principles apply, a defamatory publication gives rise to liability only if it was deliberate or if "the defendant in fact entertained serious doubts as to [its] truth," St. Amant v. Thompson, 390 U.S. 727, 731,

---

1. The leading Supreme Court decisions developing the *Sullivan* rule in the libel area are St. Amant v. Thompson, 1968, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262; Curtis Publ. Co. v. Butts, 1967, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed. 2d 1094; Garrison v. Louisiana, 1964, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125.

2. The potency of this First Amendment interest is demonstrated by the Court's application of the *Sullivan* standard, by analogy, to an action for invasion of privacy, Time, Inc. v. Hill, 1967, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456, and to a state employee's right to criticize her superiors publicly without fear of sanction, Pickering v. Board of Education, 1968, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811.

88 S.Ct. 1323, 1325, 20 L.Ed.2d 262.[3] Such "reckless disregard" may be shown circumstantially, if the evidence demonstrates that the existence of a good faith belief in the truth of the material was highly improbable, *ibid.* at 732, 88 S.Ct. 1323. The credibility of a claim that the publisher's failure to suspect falsity was in good faith and not reckless is a question of fact, which may depend on the circumstances surrounding publication, the reliability of sources, the opportunity available to investigate, and the urgency of publication, as well as the degree of sensationalism, from which improbability may be inferred and which may also increase the likelihood of damage to the individual defamed.[4]

■ Life published a photograph of the plaintiff in the company of a man identified as a "convicted murderer" and as an "ally" of a man characterized in the same article as "a hoodlum and the lord of one of the richest and most corrupt criminal fiefdoms in the land."[5] The caption under plaintiff's picture reads, in part, "Subject: how to assure defeat of a sheriff who has made trouble for the Mob," and states that plaintiff and the other man were discussing a fund to back a candidate for sheriff of Jefferson Parish opposing the anti-racketeer incumbent. These comments about Blanke, if false, would clearly be defam-atory and, if published with knowledge of their falsity or reckless disregard of truth or falsehood, would be grounds for liability.[6]

The caption was written on the basis of a dispatch submitted to Life by David Chandler, a distinguished journalist who was at the time a "stringer" engaged in investigating Cosa Nostra activities in Louisiana for a Life series on organized crime. Chandler had accompanied Life photographer Arthur Schatz to the Mist Restaurant in Jefferson Parish, where Schatz took the photograph in question. One of the owners of the Mist was a brother of the alleged Louisiana underworld boss; the restaurant was leased to the man pictured with Blanke.

In the dispatch sent to Life concerning the incident,[7] Chandler said that Blanke called across the room to the other man in the photograph and said something about getting campaign contributions for the named sheriff candidate; according to Chandler's message, the two then conferred on the need for funds and the possibility of putting through a "deal" concerning a highway right-of-way. He also forwarded a copy of the police record of Blanke's companion. Blanke's affidavit denies that he participated in any such conversations, and refers to the deposition of Arthur Schatz, who testified that he did not

---

3. The Fifth Circuit quoted and applied this statement, as the distillation of the the *Sullivan* actual malice standard, in Time, Inc. v. McLaney, 5 Cir. 1969, 406 F.2d 565.

4. St. Amant v. Thompson, *supra*, n. 1; Curtis Publ. Co. v. Butts, *supra*, n. 1; Washington Post Co. v. Keogh, 1966, 125 U.S.App.D.C. 32, 365 F.2d 965, 20 A.L.R. 3d 972, cert. denied, 1967, 385 U.S. 1011, 87 S.Ct. 708, 17 L.Ed.2d 548.

5. The statements in question appear in Life Magazine, Vol. 63, No. 10 (September 8, 1967); the article on organized crime runs from pp. 91–104, with a related editorial on p. 4 (the first installment of the series, 13 pages long, ran the previous week); the segment on crime in Louisiana is published at pp. 94–97, and the picture of plaintiff with accom-panying caption is on p. 97. The whole series is in the record.

6. At the time of publication, plaintiff was a candidate for the Jefferson Parish Commission Council, a status that would qualify him as a public figure to whom *Sullivan* principles apply, St. Amant v. Thompson, *supra*, n. 1. In addition, in Time, Inc. v. McLaney, *supra*, n. 3, the Fifth Circuit followed the rationale of Time, Inc., v. Hill, *supra*, n. 2, and held that organized crime was a matter of legitimate public concern so that its discussion was protected to the extent of *Sullivan*, regardless of the personal obscurity of individuals mentioned in that discussion.

7. A copy of the dispatch is in the record, and Chandler reiterates this recollection in his deposition, also in the record.

hear the reported statements. In addition, the man pictured with Blanke testified in his deposition that Blanke was a whiskey salesman who was visiting him on a routine sales solicitation, and that no political discussions took place. Blanke also introduced the affidavit of another customer of the restaurant, denying that Blanke made any comments from across the room concerning the sheriff's election.

Thus the principal factual issues in any post-*Sullivan* libel action remain in heated contention: was Chandler's report of Blanke's alleged remarks true? If not, was it deliberately untrue or made with reckless disregard of the facts? If the evidence presented at the trial reflects what was introduced or alluded to in the papers on the motion for summary judgment, the jury as triers of fact and judges of witnesses' credibility might conceivably conclude that Chandler deliberately misrepresented what Blanke said or that he reported the alleged conversation despite serious doubt about the accuracy of his recall.

At the trial, the plaintiff's case may consist of so little evidence that the court may not even permit the case to go to the jury. Or the jury may believe Chandler and disbelieve the other witnesses. Or the court might find a jury verdict for plaintiff unsupported by the ultimate record, and set it aside. But it cannot now be said that the evidence that plaintiff might adduce, together with all the inferences a jury might draw from it, is so insubstantial that the jury would be bound to find that Chandler reported truth or was merely negligent (as distinguished from reckless) in his failure to recount accurately what occurred.

The court's role in evaluating evidence is the same on motions for summary judgment and for directed verdict or verdict n. o. v. But in the latter situations, the plaintiff will already have been put to his trial burden of establishing the prima facie elements of his claim;

> if he does not, the defendant is entitled to a directed verdict. But if the defendant moves for summary judgment on the ground that plaintiff does not have an enforceable claim he has the burden of clearly establishing the lack of any triable issue of fact and must take the initiative of marshalling a record so showing. 6 Moore, Federal Practice (2d ed. 1965) ¶ 56.-04[2].

This distinction is particularly significant in a case such as this, where the factual issues in controversy depend almost entirely on the credibility of the witnesses. Without observing the demeanor of witnesses, and hearing cross-examination or attempts at impeachment, the court can hardly grant summary judgment on the ground that one affidavit is more believable than another.

Another question suggested by Time, Inc. as a defense against liability also remains in dispute: was Chandler's status with Life that of an independent contractor so that the publisher is not responsible for his acts? The characterization of his relation to Life Magazine is inherently a factual determination, to be resolved by weighing a number of factors. The Restatement of Agency, for example, says:

> * * * In determining whether one acting for another is a servant or an independent contractor, the following matters of fact, among others, are considered:
>
> (a) the extent of control which, by the agreement, the master may exercise over the details of the work;
>
> (b) whether or not the one employed is engaged in a distinct occupation or business;
>
> (c) the kind of occupation, with reference to whether, in the locality,

the work is usually done under the direction of the employer or by a specialist without supervision;

(d) the skill required in the particular occupation;

(e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;

(f) the length of time for which the person is employed;

(g) the method of payment, whether by the time or by the job;

(h) whether or not the work is a part of the regular business of the employer;

(i) whether or not the parties believe they are creating the relation of master and servant; and

(j) whether the principal is or is not in business.

A.L.I., Restatement of the Law 2d, Agency, § 220. The Louisiana cases apply similar criteria, viewing the issue as a question of fact.[8]

The affidavits introduced with regard to David Chandler's arrangement with Life Magazine disclose that some elements of employee status were present (e. g., he was paid by the hour, assigned a subject and remained in constant touch with the editorial workers in New York with regard to progress on the story, his work was part of the regular business of Time, Inc.); some were not (he was apparently retained on a project basis, he worked for others in a similar capacity, and considered himself an in-

dependent contractor). The issue is one for a jury to determine.

In addition there is some authority (as yet not explored in briefs by either party) that the principal may be liable for the non-physical torts of its agent, even though the agent is not a servant in the traditional sense. The Restatement of Agency 2d, § 252, states:

If a servant *or other agent,* authorized to do an act provided certain conditions exist, and to determine whether or not such conditions exist, does the act in the erroneous belief that such conditions do exist and thereby commits a tort, the principal is subject to liability for the act. (emphasis added)

The Comment to this section declares:

a. The rule stated in this Section applies to acts which constitute trespass to the person or to property, to deceit, *defamation,* malicious prosecution and interference with pecuniary relations. It applies although the agent is negligent in making the mistake and *whether or not the agent is a servant.* (emphasis added)

Without all the facts before us, it is needless to attempt to determine whether this principle is applicable under Louisiana law in this constitutional context, but the situation indicates that the suggested rule might be relevant. The examination of crime in Louisiana, based on Chandler's research, is one section of an article that was published in a two-part series on organized crime. The only byline given in either installment is that of Sandy Smith, and David

---

8. See, e. g., Blanchard v. Ogima, 1968, 253 La. 34, 215 So.2d 902; Amyx v. Henry & Hall, 1955, 227 La. 364, 79 So.2d 483; Yates v. KTBS, Inc., La.App.1967, 197 So.2d 368 (minimum wage action, in which news photographer doing contract work for television station was held to be an employee).

9. The record does not indicate whether Life had other reporters working with

Chandler investigating crime in Louisiana. However, if the reference is to Chandler it may be worth noting that an interview with Orleans Parish District Attorney Jim Garrison is reported in the article with the phrase "he told LIFE" included several times. Thus in this instance Life, rather than the individual interviewer, directly claimed public responsibility for the investigation.

Chandler is nowhere mentioned as an independent contributor or participant.[9] The affidavits of Life editorial staff members indicate that Chandler was part of a project team, collaborating on the research and writing. The end result was published as an article by Life, not as the opinion of Chandler or any other particular writer.

Life contends, alternatively, that Chandler's status is irrelevant. Even if he was an employee, Life argues, it is liable only for defamations published as the result of the actual malice (in *Sullivan* terms) of those high enough in the editorial hierarchy to have had a part in determining editorial policy. In this litigation David Chandler has been acclaimed by Time, Inc. as a Pulitzer Prize winner and renowned journalist; his excellent professional reputation is attested by at least six affidavits filed in the record on behalf of defendant. The argument suggests, however, that his judgment was not of sufficient moment for Life's decision on what should be included in the article to justify holding the publication accountable for what Chandler wrote, however untrue and however motivated; perhaps this is because Chandler was merely a reporter and not an editor.[10]

Just where Life suggests the law draws the line of responsibility is not clear. Copy for a national publication passes through many hands. The record indicates that the information submitted by Chandler was passed to a researcher, a caption writer and the general editor of the series. Blanke is mentioned only in a brief three-sentence caption, and the record does not contradict the possible inference that the only person to give any serious attention to the substantive accuracy of what was said about him personally was David Chandler. If those with whom Chandler was working were justified in relying on his reporting skill, that very reliance indicates the assumption of both the credit and the blame for his product.

If there is a rule of law premising liability under the *Sullivan* doctrine on the status within the publisher's hierarchy of the particular individual who bears malice toward the plaintiff, it must be formulated and applied to the facts in a particular case. To say that every publisher must separately check each and every detail of a story would impose the very burden on free discussion in the media that the *Sullivan* rule was designed to avoid. However, in some circumstances the publisher must accept as its own the recklessness or malice of those whom it engages to give expression to its editorial policy. The *Sullivan* doctrine should not be so interpreted as to deny recompense for libel to those who lack celebrity and hence are un-

---

10. The cases cited by defendant in support of its contention that Time, Inc. is not answerable for Chandler's actions represent situations where it was clear either that there was no recklessness, Time, Inc. v. McLane, *supra*, n. 3, or that any actual malice was that of an independent party publicly standing behind his own writing, N. Y. Times Co. v. Sullivan, *supra*, Washington Post Co. v. Keogh, *supra*, n. 4. In addition, a distinction appears to be developing gauging the degree of care required before publication by the amount of time and opportunity available, and the additional burden that such care would impose on free debate. Such a distinction is shown by the contrast between the two cases reported at Curtis Publ. Co. v. Butts, *supra*, n. 1. The suit at bar is much more similar to the situation of the Saturday Evening Post, which was held liable for its writers' reckless disregard of truth in publishing the results of an extended project, than that of the Associated Press, where, in order to meet its obligation to disseminate "hot news" as rapidly as possible, the news service was justified in putting out over the wire all information submitted to it by reliable sources that seemed plausible.

Moreover, the responsible writer in *McLaney*, *supra*, was a Life editor; it is hard to imagine whose acts could result in liability for the magazine if cases like *McLaney* are taken as establishing that the publication is insulated even from the consequences of the actual malice of an editor.

known to the editor and publisher of a national magazine, or to make compensation for lasting injury to reputation depend on whether a passing reference to a private individual's participation in events of public interest catches the eye of an executive of the publication.[11]

If it be conceded, arguendo, that some reporters are of such low rank—even in the fourth estate—that their recklessness or falsehoods are not attributable to their publishers, it cannot be said as a rule of law that no publisher is responsible for damages resulting from any reporter's state of mind, whoever that reporter may be, so long as he does not bear the title of editor. Hence, even if there be a rule that the publisher is not answerable for the quality of the product of the mere supplier of factual grist to his editorial mill, it may be appropriate for the jury to decide whether David Chandler had no more influence on what was published than had he been an inexperienced leg man, sending in data in response to specific editorial inquiry.

Based on what has thus far been told, Blanke is entitled to his day in court. Like many who come, he may depart empty-handed, and even perhaps be cut short when he rests his case. But he is entitled to try to go that far.[12]

The motion for summary judgment as to the issues mentioned in this opinion is therefore denied.

---

11. A corollary to this would be to read the two most noteworthy cases where plaintiffs have been allowed to recover under the Sullivan standard, Curtis Publ. Co. v. Butts, *supra*, n. 1, and Goldwater v. Ginzburg, 2 Cir. 1969, 414 F.2d 324, as standing for the principle that only in the case of a desperate business, where the corporate management takes a personal interest in the preparation of sensational material in order to boost circulation or for other special motives, can the publisher be found to have acted with "actual malice."

12. It should be noted that the court was informed by counsel at the pre-trial con-ference, which has already been held, that the entire trial of this case, if it should proceed to a jury verdict, is not expected to take more than one or two days. A pre-trial order has been formulated and the case is set for early trial. on January 12, 1970. Considering the extensive amount of time and effort that defendant has already devoted to its thorough presentation on this motion for summary judgment, the additional expense of a short trial does not appear to constitute a burden on free expression sufficient to justify denying plaintiff his right to present his case to a jury.