**CREDIT BUREAU OF DALTON, INC.**

v.

**CBS NEWS, a Division of Columbia Broadcasting System, Inc.**

**Civ. A. No. 13127.**

United States District Court,
N. D. Georgia,
Atlanta Division.

Sept. 29, 1971.

As Amended Oct. 8, 1971.

Ross & Finch, Atlanta, Ga., for plaintiff.

King & Spalding, Atlanta, Ga., for defendant.

## ORDER

RICHARD C. FREEMAN, District Judge.

This libel action has been submitted to the court on defendant's motion for summary judgment. A ruling on this motion had been postponed awaiting the Supreme Court's decision in Rosenbloom v. Metromedia, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971). As the parties have fully briefed the application of that case, and others, to the questions presented by this action, the motion for summary judgment is ripe for a ruling.

There are essentially two questions to be resolved in the consideration of this motion. First, do the First and Fourteenth Amendments operate in this fact situation to deny recovery for libel except upon a showing of "actual malice"? Secondly, do the facts presented by plaintiff demonstrate that there is an issue of fact from which the jury could find "actual malice"? Time, Inc. v. McLaney, 406 F.2d 565 (5th Cir. 1969).

This action arose out of the broadcasting on March 17, 1969, of a segment of the CBS Evening News with Walter Cronkite, in which Mike Wallace, a telecaster, presented an investigation of the practices of credit bureaus around the country. The research and preparation for the program was carried out by Norman Glubok, Associate Producer of CBS News, and the final writing and editing of the script was done by Robert R. Bensly, Producer of CBS News.

In his deposition, Glubok testified that he first conceived of the idea for a telecast dealing with the subject of credit bureau practices in about April, 1968, and that his interest in the subject had been sparked by various newspaper and magazine articles. In preparation for the telecast Glubok testified that he gathered all the written materials on the subject that he could find and that he interviewed the staff of Congressman Gallagher, whose subcommittee was conducting a study of the subject, and spoke with Congressman Gallagher himself as

well. (Glubok Dep., pp. 5–9). Glubok also spoke with individuals who had complained to the news media and to others about credit bureaus. (Glubok Dep., p. 14) In the final stages of his research, Glubok conducted a filmed interview of Mr. John Spafford of the Association of Credit Bureaus. (Glubok Dep., pp. 34–39).

After Glubok had completed the preliminary research, he, with the assistance of Mike Wallace, who was to telecast this segment of the Evening News, conducted an experiment with various credit bureaus; it was the preparation for and the results of this experiment which comprised the bulk of the material used in the actual telecast.[1]

Glubok selected a fictitious name, Transitair Systems, to represent a non-existent company. As was shown in the telecast, this fictitious company was "created" by Wallace's arranging with a secretarial service in New York to handle the mail and telephone calls for the company and to furnish stationery with the firm's letterhead.

The next stage in the experiment involved the sending out of twenty (20) identical letters to credit bureaus around the country, randomly selected from an industry directory. Each of the letters requested a credit report on an individual picked at random from local telephone books. The letter said that Transitair Systems was considering granting credit to that individual and requested a credit report. In response to that mailing, ten (10) bureaus sent the requested credit reports.[2] In the second mailing, twenty-eight (28) identical letters requesting full credit reports without explaining that Transitair was considering granting credit were sent out. The individuals whose credit ratings were requested were selected from those who had complained to congressional investigators or others about their credit problems. In this second mailing a letter was sent to the Credit Bureau of Dalton. As with the first mailing, the responses to these letters were described in the telecast.[3]

The program then mentioned that the Credit Bureau of Dalton, in its response, had requested Transitair Systems to sign a contract affirming that Transitair was intending to grant credit and agreeing to keep the information confidential. Credit Bureau of Dalton also inquired as to what kind of a company Transitair Systems was. Glubok signed the contract, using the alias of Norman Clayton, and replied that Transitair was "a systems company." Upon receipt of the contract, Credit Bureau of Dalton supplied Transitair with the requested credit information on Mr. Paul Stevenson.

In addition to the presentation of the experiment conducted by CBS News and the results thereof, the telecast included commentary read by Wallace and portions of the filmed interview with Mr. Spafford. While Credit Bureau of Dalton does not deny that it supplied defendant with the credit information, it alleges that it was defamed by the juxtaposition of those facts with comments about credit bureau practices. The relevant portions of the telecast are as follows:

GLUBOK: Could anyone who's interested buy a credit report on anybody?

SPAFFORD: No, sir, they could not. First of all, as I mentioned earlier, they have to be a bona fide creditor, and by that I mean they have to be in the business of extending credit to individual consumers. They go make an application to become a member of the local credit bureau. The local credit

---

1. For the complete text of the broadcast, see Exhibit A to Defendant's Answer.

2. Two bureaus offered to send information if Transitair would sign a contract with them; three others reported they had no file on the individual requested; four did not reply; two referred Transitair to its local credit bureau.

3. Seven bureaus sent the credit reports; twelve bureaus referred Transitair to its local credit bureau; one refused to furnish the information; three (including Credit Bureau of Dalton) offered to send the information if Transitair would sign a contract with them.

bureau will investigate them to find out that they are in the business of extending credit, and if they find they meet the qualifications of that bureau, they will sign a contract with that individual credit granter. And then, and only then, do they have access to credit information in the files of that bureau.

GLUBOK: Then in your opinion a person down here in Houston couldn't write to Chicago, for example, and ask for information about some Chicagoan —would he receive that information?

SPAFFORD: No, he would not. He would not.

\* \* \* \* \* \*

WALLACE: \* \* \* Under the industry guidelines we should have been told to contact our local New York credit bureau, which could then have checked out our credentials.

\* \* \* \* \* \*

WALLACE: \* \* \* The credit bureau of Dalton, Georgia, asked us to sign a written contract affirming that we were intending to grant credit and agreeing to keep the information confidential. We did so. The letter also asked us to advise what type of company we were. We replied, "We are a systems company." We mailed that off and within a few days received the credit report that we'd requested. It would seem that signing a written contract is not much of a safeguard; all the client has to do is lie. But seven of the 28 bureaus provided us with credit reports without even that precaution.

GLUBOK: What about your members who violate your rules, who give out information to people who are not entitled to it? Do you have any penalties?

SPAFFORD: We have some 30-odd membership qualifications and requirements, and any member who is

found to be violating these and is, does not correct the violation, their membership is subject to cancellation, and we do cancel them on occasion.

GLUBOK: About how many members have you cancelled over the years?

SPAFFORD: Over the years I couldn't tell you; I would say it might average ten to 15 a year.

GLUBOK: Out of 2200.

SPAFFORD: Uh huh.

WALLACE: We found more violations than that just by mailing out 48 letters \* \* \*.[4]

It now appears that the telecast may not have been entirely accurate, for there was no specific industry guideline which required that a bureau refer an out-of-town client to his local credit bureau,[5] although 14 out of 48 credit bureaus to whom CBS wrote did follow that practice.[6] Credit Bureau of Dalton seems to have complied with the written guidelines by requiring Transitair to sign a contract; further, the Credit Bureau of Dalton obtained Mr. Stevenson's permission before releasing his credit report to Transitair.

I. The initial question of law which must be determined on defendant's motion for summary judgment is whether or not this publication must be accorded the qualified protection of the First and Fourteenth Amendment such that there can be no recovery for libel in the absence of "actual malice."

In New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) the Supreme Court held that the constitutional protection of freedom of the press requires that a public official not be allowed to collect damages for a defamatory falsehood relating to his official conduct unless he can prove that the statement was made with "actual malice," that is, with knowledge that it was false or with reckless disre-

---

4. Exhibit A, Defendant's Answer, pp. 3–7.

5. See "You Can't Afford to Ignore These Guidelines: Credit Bureau Guidelines

to Protect Consumer Privacy," Defendant Bolling Exhibit 1, Bolling Deposition.

6. See Footnotes 2 and 3 *supra*.

gard of whether it was false or not.[7] At 279–280, 84 S.Ct. 710. The court there recognized that in free debate some error is inevitable and that negligent error on the part of the press must be protected in order to avoid any curtailment of the invaluable public discussion of government officials.

In the cases following New York Times v. Sullivan the court determined that the limited protection of the First Amendment reaches publications regarding all "public figures," not just those who are public officials. Associated Press v. Walker, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) (retired Army general); Curtis Pub. Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) (former football coach); Beckley Newspaper Corp. v. Hanks, 389 U.S. 81, 88 S.Ct. 197, 19 L.Ed.2d 248 (1967) (court clerk). As the Court said in Curtis Pub. Co. v. Butts, *supra,* at 152, 87 S.Ct. at 1990, "* * * [W]e have rejected, in prior cases involving materials and persons commanding justified and important public interest, the argument that a finding of falsity alone should strip protections from the publisher."

In Rosenbloom v. Metromedia, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971), the court was faced with the question whether the *Times* requirement of "actual malice" applies when the person falsely defamed was in no sense a public figure and had been relatively anonymous prior to the complained-of publication. That action was brought by a distributor of nudist magazines against the owners of a radio station which broadcast news of the plaintiff's arrest by the local police and characterized his books on the air as "obscene" rather than "allegedly obscene." When plaintiff was subsequently cleared of the charges of possession of obscene literature he sued the radio station for libel.

The plurality of the court clearly extended the *Times* standard to all issues of public interest saying that, "We honor the commitment to robust debate on public issues, which is embodied in the First Amendment, by extending constitutional protection to all discussion and communication involving matters of public or general concern, without regard to whether the persons involved are famous or anonymous." *Rosenbloom, supra,* at 43, 91 S.Ct. at 1820.

However, as plaintiff has stressed in its opposition to defendant's motion for summary judgment, that broad holding was not accepted by a majority of the court. Mr. Justice Black, holding fast to his well known view that the First Amendment prevents any recovery for libel from a publication, even if the falsehood is published with actual malice, concurred in the court's decision and would urge the court to go further in the protection of freedom of the press. Mr. Justice White also concurred in the result, making a majority of the court in favor of affirming the Third Circuit's ruling that the *Times* standard applied. However, Justice White based his concurrence on the narrow ground that since the news item was a discussion of the official action of the police department, the publication was protected by a narrow reading of the *Times* protection of publications dealing with public officials.

Justice Douglas, although he did not participate in the decision of *Rosenbloom,* has long held a most expansive view of the First Amendment. Knowing that, Justice White, in his opinion, indicates that there is an actual majority of the court which would support a constitutional rule at least as broad as that adopted by the plurality opinion in *Rosenbloom.* As Justice White explained it:

Given this spectrum of proposed restrictions on state defamation laws and assuming that Mr. Justice Black and Mr. Justice Douglas will continue in future cases to support the severest of

---

7. Hereinafter the words "actual malice" will be used as shorthand for the constitutional standard—knowledge that it was false or reckless disregard of whether it was false or not.

the restrictions, it would seem that at least five members of the Court would support each of the following rules:

For public officers and public figures to recover for damage to their reputations for libelous falsehoods, they must prove either knowing or reckless disregard of the truth. All other plaintiffs must prove at least negligent falsehood, but if the publication about them was in an area of legitimate public interest, then they too must prove deliberate or reckless error. In all actions for libel or slander, actual damages must be proved, and awards of punitive damages will be strictly limited. At 58–59, 91 S.Ct. at 1827.

Thus, while the Court in *Rosenbloom* was rather fragmented in its opinions,[8] the majority of the Court would hold the *Times* standard applicable to the defamation of any person, famous or anonymous, so long as the defamatory falsehood was part of a discussion of a matter of legitimate public interest.

In the Fifth Circuit, even prior to the decision in *Rosenbloom,* the cases have generally applied the *Times* standard to all publications concerning matters of public interest. As the Fifth Circuit held in Bon Air Hotel, Inc. v. Time, Inc., 426 F.2d 858, 861 (5th Cir. 1970), "We agree * * * that publications concerning matters of public interest are protected by the first amendment absent proof of actual malice." In Time, Inc. v. McLaney, 406 F.2d 565, 575 (5th Cir. 1969), cert. denied, 395 U.S. 922, 89 S.Ct. 1776, 23 L.Ed.2d 239 (1969), the Court held that the *Times* standard protected publications of "matters of important public concern."

*Rosenbloom* in no way lessens the precedential value of these Fifth Circuit opinions; rather, the opinions in *Rosenbloom* indicate that the Fifth Circuit correctly anticipated the direction in which the majority of the Supreme Court was headed in the area of constitutional protections against libel suits.

■ With the broadening of the application of the *Times* standard, the task then falls to the court to determine whether or not the publication complained of did concern a matter of legitimate public interest. The subject matter of the broadcast here in question was credit bureaus and their practices in releasing credit information from their files. Mr. Glubok testified that he first became interested in the subject from several newspaper and magazine articles. During the period of his research for the telecast a Congressional subcommittee was investigating this very area. The facts of two Congressional investigations of the subject, a Congressional committee's use of the subject telecast in its report [9] and recent congressional legislation [10] indicate conclusively that the precise subject matter of the telecast was an issue of great national concern. The practices of the credit bureaus in this country are no doubt of at least as much public interest as the conditions of a hotel in Augusta, Georgia, or a so-called Mafia leader's involvement in a political campaign in the Bahamas, subjects which the Fifth Circuit has held warrant the protection of the *Times* standard in libel cases. See Bon Air Hotel, Inc. v. Time, Inc., 426 F.2d 858 (5th Cir. 1970); Time, Inc. v. McLaney, 406 F.2d 565 (5th Cir. 1969).

The court therefore holds that in this libel suit against a network news program for an allegedly defamatory falsehood, the First Amendment requires that plaintiff not be permitted to recover damages except upon a clear and con-

---

8. Justices Marshall and Stewart, dissenting, would limit the *Times* rule to public figures and public officials but in all libel cases would limit damages to actual losses. Justice Harlan, also dissenting, agreed with much of the Marshall dissent, but would allow limited punitive damages in cases where actual malice was proved.

9. See Glubok Deposition, p. 59.

10. Fair Credit Reporting Act, Title VI, Public Law 91–508; 84 Stat. 1114; 1970 U.S.Code Cong. & Admin.News, 5127, 5142–53.

vincing showing that the falsehood was published with knowledge that it was false or with reckless disregard of whether it was false or not.

■ II. On a motion for summary judgment in a case in which the *Times* standard is controlling, the court must take care to observe the constitutional restrictions on libel suits, for forcing a defendant to go to trial when he has acted with First Amendment protection can in itself be a curtailment of freedom of the press, even if defendant should subsequently prevail on the merits. Time, Inc. v. McLaney, 406 F.2d 565 (5th Cir. 1969); Washington Post Co. v. Keogh, 125 U.S.App.D.C. 32, 365 F.2d 965 (1966).

■ The burden, however, on a motion for summary judgment, is on the moving party, CBS News, and the inferences to be drawn from the underlying facts contained in the depositions and affidavits presented must be viewed in the light most favorable to the party opposing the motion. United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); Vandenburg v. Newsweek, Inc., 441 F.2d 378, 379 (5 Cir. 1971).

The court's function, then, on this motion is to determine whether defendant CBS News has demonstrated that there is no issue of fact from which a jury could find that defendant published false statements regarding plaintiff with "actual malice."

Although defendant has not conceded that false statements were made, it seems to the court that a jury could find that the reasonable inference to be drawn from the telecast was that Credit Bureau of Dalton was in violation of the industry guidelines in releasing the credit report on Mr. Stevenson to Transitair Systems, Inc. Further, it seems clear that a jury could find that such an implication was factually incorrect and that there was no industry guideline which re-

quired Credit Bureau of Dalton, in this situation, to go through a credit bureau in New York City before releasing credit information to Transitair Systems, Inc.[11]

■ The remaining question, then, is whether or not there is sufficient evidence to give rise to an issue of fact from which a jury could find that defendant published false statements with "actual malice"—that is, that defendant published with reckless disregard or with "serious doubts as to the truth of his publication." Rosenbloom v. Metromedia, 43 U.S. at 56, 91 S.Ct. at 1826 (1971); St. Amant v. Thompson, 390 U.S. 727 at 731, 88 S.Ct. 1323, 20 L.Ed. 2d 262 (1968).

Plaintiff argues that the evidence put forth in depositions and an affidavit supports its allegation of "actual malice" in the following four respects: (1) defendant took a small portion of the Spafford interview out of context so as to have the portion telecast indicate that plaintiff had violated industry guidelines and defendant then destroyed the unused portions of the interview; (2) defendant failed to investigate the facts, even though this telecast was not "hot news"; (3) Glubok admitted prior direct contact with Stevenson, indicating knowledge of Stevenson's having given his permission to plaintiff to release the credit report; and (4) defendant deceived plaintiff by the use of a fictitious name for a non-existent corporation and a false description of the non-existent company.

In support of the first allegation of "actual malice", plaintiff has submitted a sworn affidavit from Spafford which discusses the filmed interview in detail. Defendant does not dispute Spafford's statement that the interview itself was approximately thirty (30) minutes in length and that only three short segments of the interview, totalling about one and one-half minutes in length, were used in the telecast. The crucial part of

---

11. See "You Can't Afford to Ignore These Guidelines: Credit Bureau Guidelines to Protect Consumer Privacy," Defend-

ant Bolling Exhibit 1. Bolling Deposition; Spafford affidavit, pp. 2–3.

Spafford's affidavit is the following statements:

11. To the extent that the CBS broadcast of March 17, 1969, indicated that a local bureau must check an out of town request through an out of town bureau where a customer's contract had been obtained, it was inaccurate and misleading.

12. I did not convey to Mr. Norman Glubok in our filmed interview any idea that any such regulation, qualification, requirement, guideline, policy, practice, or law did exist. To the extent that my comments were used to convey such an idea in the relevant broadcast, they were taken out of context and misconstrued.

13. Regarding CBS's particular reference to the Dalton Credit Bureau's "violation" of some standard, there was nothing in my interview with Mr. Norman Glubok which could be reasonably interpreted to mean that to act as Dalton Credit Bureau did and release information to an out of town customer after securing a contract from that customer constituted a "violation" of any standard with which I am familiar. To use my comments to indicate that such action was a "violation" was to misconstrue them and quote them out of their proper context.[12]

Defendant seeks to weaken the force of the Spafford affidavit by arguing that Spafford's statements are not supported by any other evidence in the record and by pointing out that Spafford concedes that he does not remember precisely everything that was said during the interview. In response to the charge that the unused portion of the filmed interview was deliberately destroyed by CBS, defendant counters that it was the normal business practice to discard unused film.

While defendant's arguments might convince a jury that the editing of the interview did not constitute "actual malice", plaintiff's allegations, supported by the Spafford affidavit, necessitate a finding by the court that defendant has not carried the burden of showing that there is no material issue of fact from which a jury could find "actual malice." On this basis the motion for summary judgment must be denied.

While the court feels that the above is sufficient allegation of "actual malice" to require the denial of the motion for summary judgment, the court points out that plaintiff's other allegations, standing alone or together, may constitute sufficient evidence constitutionally to support a finding by the jury of "actual malice." While plaintiff might need to produce additional facts to support it, the allegation of failure to investigate might create a jury issue, for, "The Supreme Court has held that actual malice may be inferred when the investigation for a story which is not 'hot news' was grossly inadequate in the circumstances." Vandenburg v. Newsweek, Inc., 441 F.2d 378 at 380 (5th Cir., 1971); Curtis Publishing Co. v. Butts, 388 U.S. 130, 156–158, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967).

In regard to the allegation concerning contact with Stevenson, Glubok has stated that his conversation, if any, with Stevenson occurred many months prior to the request by Transitair for Stevenson's credit report and that therefore Glubok could not possibly have had actual knowledge of Stevenson's consent to the release of information.[13] However, if plaintiff were able to prove that Glubok spoke with Stevenson *after* Stevenson's decision to allow the release of his credit report to Transitair, plaintiff might be able to meet the constitutional standard of "actual malice."

As for the use of the fictitious company in order to extract cooperation from defendant, it appears at this time that plaintiff could not show "actual malice" on that basis, for the use of an investigative cover does not seem to have any bearing on the question whether defendant acted in reckless disregard for

---

12. Spafford affidavit, p. 3.

13. Glubok deposition, pp. 46, 47, 53.

the truth or falsity of the allegedly implied statement that plaintiff acted in violation of industry guidelines.

It is perhaps helpful at this time to repeat the Fifth Circuit's warning in Vandenburg v. Newsweek, Inc., 441 F.2d 378, 380 (5th Cir. 1971), in affirming the denial of a motion for summary judgment in a case similar to the present one, "We caution against attempting to glean from this decision any whisper of what the outcome should be on a motion for a directed verdict, on the final verdict, or on a motion for judgment n. o. v."

This motion has raised questions of law which are controlling as to the outcome of this litigation. As it appears to the court that there is substantial ground for differences of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, this order is hereby certified for an interlocutory appeal pursuant to 28 U.S.C. § 1292.

For the above stated reasons, defendant's motion for summary judgment is hereby denied.

It is so ordered.