Thomas R. FADELL, Plaintiff,

v.

**MINNEAPOLIS STAR AND TRIBUNE COMPANY, INC., et al., Defendants.**

No. 72 H 311.

United States District Court,
N. D. Indiana,
South Bend Division.

Dec. 1, 1976.

Lowell E. Enslen, Hammond, Ind., for plaintiff.

Daniel F. Kelly, Hammond, Ind., Roger Bryant Hunting, Greenbaum, Wolff & Ernst, New York City, John W. Vardaman, Jr., Joseph A. Califano, Jr., John B. Kuhns, Washington, D. C., Harry A. Psimos, Merrillville, Ind., for defendants.

## MEMORANDUM OPINION

ALLEN SHARP, District Judge.

The defendants have all filed motions for summary judgment on the basis of the pleadings, the depositions and answers to interrogatories on file with this Court, and the documentary materials annexed as exhibits to the motions. This memorandum opinion provides the backdrop and basis for the separately entered findings of fact and conclusions of law.

## PRELIMINARY STATEMENT

The plaintiff, Thomas R. Fadell, (hereinafter "Fadell"), the elected Tax Assessor of Calumet Township, Lake County, Indiana, instituted this libel action predicated upon an article in the November 1972 issue of *Harper's Magazine* entitled "A Tax Assessor has Many Friends." Named as defendants in the action are George Crile (hereinafter "Crile"), the author of the article; Anne Crile, the author's wife; Minneapolis Star and Tribune Company, Inc. (hereinafter "Minneapolis"), the publisher of *Harper's Magazine* through its division Harper's Magazine Company; John Cowles, Jr. (hereinafter "Cowles"), the President and Chairman of the Board of Minneapolis; Russell Barnard (hereinafter "Barnard"), who held the office of Publisher at *Harper's Magazine*, and Robert Shnayerson (hereinafter "Shnayerson"), who was the Editor-in-chief of *Harper's Magazine*. Motion for summary judgment is made on behalf of Minneapolis, Cowles, Barnard and Shnayerson. Simultaneously defendant George Crile and his wife, Anne Crile, have brought

on motions for summary judgment. The essence of the author's motion is to establish that on the record in this case there is no basis on which this Court can find that any statements in the article of and concerning the plaintiff were written and published by the author with knowledge of falsity or in reckless disregard of the truth, i. e., with "actual malice", within the meaning of applicable law. In support of Crile's motion eight volumes of documentary exhibits which contain the materials upon which he relied in preparing the articles have been submitted.

Thus, the Harper defendants have adopted in all respects the memorandum and exhibits submitted on behalf of the author Crile.

## STATEMENT OF FACTS

Nelson Aldrich (hereinafter "Aldrich"), who is not a named defendant, was an Associate Editor of *Harper's Magazine* and the member of the editorial staff who had direct and principal responsibility for the publication of the article.

George Crile, the author of the article in question, began his work on this article when he was a reporter for the *Post-Tribune* in Gary, Indiana in 1970 and 1971.

Prior to joining the *Post-Tribune*, Mr. Crile had done investigative work for Drew Pearson and Jack Anderson. Mr. Crile holds a bachelor of arts degree from Trinity College, where he majored in history. His undergraduate education included one and one half years at Georgetown University's School of Foreign Service. Mr. Crile also served in the Marines including a period of study at the Defense Language Institute in Monterey, California. Upon completion of his military obligations, Mr. Crile sought employment at the *Post-Tribune* and was hired by the paper's publisher, Walter Ridder.

Crile joined the reporting staff of the *Post-Tribune* in March, 1970. During his first months on the paper, he covered a variety of stories, many of which were personally assigned and edited by the paper's

publisher, Walter Ridder. Ridder found Crile to be a "very good reporter, [an] excellent one." Some of Crile's early stories related to political corruption and maladministration in city and county government. In 1971 Ridder offered Crile a promotion to the Ridder Newspapers' Washington bureau as its Pentagon correspondent. Crile held that position until he left Ridder Publications in January 1972. Mr. Crile's work at the *Post-Tribune* led to a number of journalistic awards, including the United Press International Indiana Newspaper Editors Award for 1971. Subsequent to his leaving Ridder Publications, Crile submitted to *Harper's* a draft of the article which became the subject of this litigation; in addition, he continued research on a book he was writing and was asked by the Fund of Investigative Journalism to evaluate a proposal to investigate presidential campaign contributions. He has been employed by *Harper's* since 1974 and is presently Washington Editor.

Aldrich first met Crile, then a free lance journalist, in early March of 1972. He had been asked to see Crile by a fellow journalist, Steve Schlesinger, who told him that Crile had a series he was trying to get published (Aldrich, p. 18).[1]

At their first meeting Crile brought with him a text of a "nine part" series [2] which he told Aldrich had been written when he was a reporter for the Gary, Indiana Post-Tribune (*Id.* at p. 19). Crile told Aldrich of his work on the Gary Post-Tribune as an investigative reporter and his special relationship with Walter Ridder, the publisher of that newspaper (*Id.* at pp. 20, 29–30). He told Aldrich that the series had not been published by the Post-Tribune and of the circumstances of the termination of his employment at the Post-Tribune after he had been promoted by Ridder to the Post-Tribune Washington Bureau (*Id.* at pp. 20, 21). Aldrich learned about the kind of stories Crile had covered in Gary. "What he had

published in the Post-Tribune was very serious articles, which were not chasing fires." (*Id.* at p. 35).

Crile told Aldrich "the gist of the story" contained in the "nine part" series (*Id.* at p. 38) and "in a general way how he collected the information he did with respect to Mr. Fadell." (*Id.* at p. 722)

At the time of this first meeting Crile was not trying to sell the series to Harper's " . . . the purpose of the meeting was for me to help him get the series published . . ." (*Id.* at p. 39) However, after hearing Crile's story and getting a favorable impression of his character and ability Aldrich told Crile that Harper's might be interested in the story, although there was no way in which Harper's could publish a nine part series (*Id.* at p. 46).

After this meeting Aldrich read the "nine part" series which was devoted exclusively to the activities of the tax assessor of Gary. (*Id.* at pp. 39, 69.) He was very impressed with it "both as to its value, potential value as a magazine article and its inherent value as a series for a newspaper." (*Id.* at p. 69)

Aldrich testified that "the story he had to tell in the nine part series . . . (was) not exactly surprising to anyone who knew anything about Gary, which I happened to know . . ." (*Id.* at p. 40)

Aldrich, in the course of his fifteen year post-college career, primarily in journalism (*Id.* at pp. 5–15), had been editor of Trans-Action Magazine, which was

"devoted to social problems, sociologically treated—and Gary, for a number of reasons has been a subject of interest to sociologists, urban planners, and so forth, for quite a long time, and so in the course of my working at Trans-Action I had read a goodly number of articles of various kinds on that city. There there was a piece in Harper's Magazine, I think about 4 years ago, on Gary . . . I know

---

1. Deposition of Nelson Aldrich, hereinafter referred to as "Aldrich".

2. As indicated in the Aldrich deposition, there was some uncertainty in Aldrich's mind whether the series was in 6 or 9 parts. However, it was most often referred to in that deposition as a "nine part series."

the photographer who took that picture (a picture which appeared in that article) and he had spent some time in Gary and I talked to him about it." (*Id.* at p. 43). Aldrich's career had given him a broad background in political and social affairs; also he had been an American history and literature major at Harvard (*Id.* at p. 14).

After having read the series Aldrich arranged another meeting at which time he interrogated Crile respecting the material upon which the series was based[3] and discussed how a magazine article might be constructed out of the series. In the months that followed there were continuous discussions between Crile and Aldrich, in which Aldrich questioned Crile and they discussed the material. Crile told Aldrich about his documentation. (*Id.* at p. 295).

Between the second meeting and April 24, when Crile and Aldrich met again, Crile worked on putting the material in magazine form (*Id.* at pp. 57–58). After the meeting of April 24 Crile returned to Washington and continued writing (*Id.* at pp. 59–60). In early May Crile submitted an article about 60 pages long (*Id.* at p. 58) which Aldrich read and reread, trying to find an appropriate structure. During these months of writing and rewriting Aldrich made structural suggestions; he suggested inclusion of the theme of Crile's relationship to Ridder and the theme of the election campaign between Dr. Williams and Mayor Hatcher (*Id.* at p. 70). The Post-Tribune assessment material which appears in the Harper's article grew out of the Ridder theme (*Id.* at pp. 72–73). Aldrich and Crile had many meetings and telephone conversations throughout this period.

Crile cut the 60 page manuscript and sent the cut version to Aldrich, who worked on it over the July 4 weekend (*Id.* at pp. 69–70).

Aldrich had formed a favorable impression of Crile at their first meeting. (*Id.* at p. 279). Aldrich stated that the first meeting was primarily concerned with establishing "what kind of guy he was. This has a direct bearing on whether the story was true or not" (*Id.* at p. 279). After the first meeting with Crile, Aldrich spoke to Steve Schlesinger about him. Schlesinger told Aldrich that Crile was a man of integrity and common sense (*Id.* pp. 120–121). Aldrich also spoke about Crile with Jules Pfeiffer who said that Crile was an intelligent man, a man of character (*Id.* pp. 121–122) and with Richard Elman, who knew Crile well and had a high regard for his work (*Id.* at p. 124). Aldrich had learned that Crile was the step son-in-law of the columnist, Joseph Alsop, and the son-in-law of Susan

---

**3.** The Crile brief and the exhibits demonstrate the nature of Crile's research, its scope and depth. Crile had studied numerous published articles on the subject of tax assessment and politics in Indiana and in Gary, including earlier Post-Tribune exposures of abuses in the city tax assessor's office, of the Chacharis political machine and political hiring in Gary at election time. Crile had examined published materials respecting the assessment of the U. S. Steel plant in Gary. He had examined the report of the Northwest Indiana Crime Commission on corruption in Lake County, and the study of the Lawyers Commission for Civil Rights Under Law of the Indiana property tax system.

He had interviewed a large number of public officials, leading citizens and experts with respect to tax assessments in Gary, political conditions in Gary and election events in Gary. Crile had been initially assisted in his investigation of Gary tax assessment by Wilbur Saleb, who had worked for both the Internal Revenue Service and the Gary Tax Assessor's Office, and was familiar with the working and practices of the Assessor's office.

Crile had studied the public records, both with respect to payrolls and with respect to tax assessments. He had examined the assessment records of a number of companies over a period of years, tracing the history of Fadell's assessments of those companies and comparing Fadell's assessments with those of the State Board of Tax Assessors. Crile had interviewed businessmen, lawyers and journalists familiar with the subject and who had experienced what went on in Gary and in the Assessor's office. He had obtained statements (some in writing, some on tape) from former employees in the Assessor's office, from former Fadell campaign workers who were on the public payroll, from businessmen and lawyers who had dealt with Fadell and his agents.

Crile had obtained the assistance of Oral Cole, a former IRS official who had worked on IRS investigations of Fadell. Cole gave Crile information about the IRS investigations of Fadell, and made IRS documents relating to Fadell available to Crile. Crile was also given access to Grand Jury materials.

Alsop, who was an old friend of Aldrich's. Aldrich recalled Susan Alsop's having told him (before he met Crile) how well Crile was doing in his newspaper career (*Id.* pp. 117–120, 869). Marietta Tree (a former United States official at the United Nations and friend of Aldrich) also spoke well of Crile to Aldrich (*Id.* at pp. 117–120). Aldrich introduced Crile to a literary agent, Goerge Obst, and they discussed Crile's talent (*Id.* at p. 123).

On the basis of his review of the material, his meetings and discussion with Crile, his knowledge of Crile's background and credentials, and his own background and experience, Aldrich came to have "every confidence in Mr. Crile" (*Id.* at p. 115). His work with Crile led him to "very much *doubt*" that Crile would make a mistake in judgment (*Id.* at p. 226). If he had made a mistake it would have been an honest mistake (*Id.* at p. 499). Aldrich had confidence in Crile's credibility and believed that Crile had a high degree of accuracy and competence (*Id.* at pp. 315, 318, 319).

Aldrich did not believe that Crile had any "ill will or spite" against Fadell—"quite the contrary" (*Id.* at p. 234). (See also *Id.* at pp. 541, 543, 544) Nor did he believe Crile "had an axe to grind" respecting Walter Ridder . . . "Not at all. This was surprising to me. I would like to put on the record . . . I would have expected that and I probed for that." (*Id.* at pp. 234, 237) Aldrich testified that he "had evern [sic] reason to believe that Crile's desire for accuracy and fairness was real" (*Id.* at p. 240) he had "ascertained to my own satisfaction that his character was good and his journalist skills were adequate for this job and I relied thereon" (*Id.* at p. 242). Aldrich arrived at his judgment "by talking to him, as I did at great length and by examining the product" (*Id.* at p. 244).

Aldrich was constantly concerned "for the truth of the material" (*Id.* at p. 277). "The most serious point in determining whether we should publish the article was its accuracy" (*Id.* at p. 278).

Repeatedly Aldrich made clear that ". . . my whole attitude toward the

article was questioning, getting it right" (*Id.* at p. 796). Thus, for example, he testified:

". . . I questioned Mr. Crile at every opportunity with respect to where he got his information, what that information was and I also queried at the outset his character and motives, if you will, and then was very careful to see that the article was inherently consistent and logical . . ." (*Id.* at p. 795)

Similarly, he testified:

". . . throughout our relationship over this article, and insofar as we were concerned about that [accuracy] I would ask him, in effect, 'Well what is the background of that particular part of the story?'"

"And he would say, 'Well, this and such happened.'

'I spoke to so and so. I got this information in such and such a way'." (*Id.* at p. 273)

Aldrich described the process at pp. 310, 311 of his deposition:

"Let us take it concretely. The author, Crile, makes a statement. I would say—I would not begin necessarily with the presumption of that statement's accuracy. I would say 'How do you know that?' Can you back it up? . . .' And he would say, 'Yes, I can with such and such a document or the testimony of such and such a concern'."

With respect to the specific items in the article, for example the Post-Tribune assessment material, Aldrich testified: "I recall asking him about that particular story or comment or allegation in his article as I did about most of the others, how he knew what he said." (*Id.* at pp. 76–77); "I think I queried the point as I queried all of them. I said—I asked him what documentation or proof he had of that, and he told me . . . I recall he told me that he had gone out to Gary, Indiana, and assessed the truth of that allegation . . . I was satisfied that he had documentation" (*Id.* at p. 78; See also *Id.* at pp. 232, 811–812).

With respect to the incident of Crile being driven off the road, "we went over this incident very carefully" (*Id.* at p. 158).

With respect to the diversion of public funds to Fadell's political or personal use: "I did what I did about all points in this article, I queried him about what evidence he had to make this assertion and he told me he had the testimony of people" (*Id.* at p. 185).

The Aldrich deposition established that Aldrich elicited the facts supporting the article from Crile during these months of pre-publication review. Thus, Crile told Aldrich about the Muskie Sub-Committee hearing, Fadell's testimony there and showed Aldrich Jack Anderson's reports on this (*Id.* at pp. 354, 359); Crile advised Aldrich of the Nader activities and the Chicago Businessmen's Committee activities (*Id.* at p. 357); Crile told Aldrich about the grand jury investigation of Fadell (*Id.* at pp. 357, 440); Crile told Aldrich he had IRS documents obtained from Oral Cole (*Id.* at pp. 409–410) and about his access to grand jury material (*Id.* at p. 455); Crile told Aldrich about the businessman threatened by Fadell whose assessment was increased because he refused to back Fadell and gave him the businessman's name (*Id.* at p. 411); Crile told Aldrich of the Dun & Bradstreet reports on Fadell (*Id.* at 425); Crile gave Aldrich the background for the story of Fadell's conduct before the grand jury (*Id.* at pp. 451–452); Crile gave Aldrich details respecting Fadell's relatives on the public payroll (*Id.* at p. 565); Crile gave Aldrich details respecting persons on the public payroll who did private work for Fadell (*Id.* at pp. 573, 575–577); Crile told Aldrich that he got the facts as to hiring campaign workers on the basis of signed statements of campaign workers (*Id.* at pp. 591, 616) and the assessor's payroll records (*Id.* at p. 617); and Crile told Aldrich that he had statements from people who were directly involved in these matters (*Id.* at pp. 687, 693). Aldrich testified that Crile probably gave him the names of "corporate conduits" (*Id.* at pp. 751–752) and that they had talked about Fadell's various business interests (*Id.* at p. 760); Crile told Aldrich of his examination of public documents in the auditor's office (*Id.* at p. 825); and Crile told Aldrich of the economist who had studied the U.S. Steel assessment. . . . "He was in some neighboring university, I have forgotten his name" (*Id.* at p. 853). Crile told Aldrich he had seen the tax assessment records for the Post-Tribune (*Id.* at pp. 76–78).

On the basis of his work with Crile, Aldrich was convinced that the article was true and accurate (Aldrich *passim*, e. g. pp. 411, 421–422, 434–435, 455, 460, 461, 468, 515, 651, 679, 789, 891–892).

Aldrich was thus made fully aware by Crile of the kind of documentation Crile had obtained to back up the statements in the article, but Aldrich did not himself examine the documentation. He expected such examination—to the extent appropriate—to be conducted by counsel. (*Id. passim*).

After these months of work by Crile and Aldrich, culminating in Aldrich's editing over the July 4 weekend, the manuscript went to the other Editors of Harper's and to Robert Shnayerson, the Editor-in-Chief (*Id.* at pp. 74–75; Shnayerson deposition at p. 8).[4]

Shnayerson, as Editor-in-Chief of Harper's was in overall charge of the editorial aspects of the magazine (Shnayerson at p. 18). Shnayerson had years of experience in reporting, including working as a reporter for the New York Daily News, as a reporter for Life Magazine, a correspondent and bureau chief for Time-Life News Service, as a contributing editor for Time Magazine, as the editor of the Education Section of Time for five years, of Times Law Section for three years and senior editor of the Essay Section at Time Magazine (*Id.* at pp. 10–15).

Shnayerson was responsible for Harper's efforts toward being a "responsible publication . . . with some influence" (*Id.* at p. 22). Harper's editorial policy was to seek accuracy and fairness in matters that it

---

4. Hereinafter referred to as "Shnayerson".

published (*Id.* at p. 25). To effectuate this policy his subordinates had been directed to

"make every effort to make sure that writers had documented their articles; that they have some record, either written or on tape, backing up statements that may be questionable; that they bring up all controversial points with our counsel who is retained by us on a regular basis; that they be alert to anything that might be questionable" (*Id.*, p. 26).

Harper's does not have a research staff "as does Time" (*Id.* at p. 32). It, therefore, had to rely principally on the writer, the writer's representations and on Harper's judgment of him (*Id.* at p. 32).

With respect to this article, since it was an article based upon the author's personal experience, Shnayerson considered the author's personal credibility very important (*Id.* at p. 108). Shnayerson had personally met Crile prior to publication of the article. This occurred shortly after Shnayerson had read the manuscript (*Id.* at p. 140). Shnayerson discussed Crile's background and interest in journalism in order to evaluate Crile. Shnayerson was interested in Crile's bearing, his manner of conversation, whether he spoke in a forthright manner and whether he appeared to be a stable individual (*Id.* at p. 147).

As a result of the reading of the manuscript, Aldrich's judgment of Crile and his own personal meeting with Crile, Shnayerson concluded that Crile was a "very sound, strong and straight young man" (*Id.* at p. 251), whose character was good (*Id.* at pp. 145, 161, 251).

In addition to Aldrich and Shnayerson, other editors at Harper's read the article and approved it (Aldrich, pp. 74–75). Shnayerson stated that the reason the article was published by Harper's was because it was:

"a matter of great public interest; it was a fascinating article; it was a rare example of journalism which casts light on a political process, the nature of power in

American communities. It was a contribution to enlightenment on how this country works in various places; because it was a dmn good article" (Shnayerson, pp. 302, 418).

Shnayerson also noted that he found the article to be fair and accurate as far as the final version that went into press (*Id.* p. 361). In addition to the article being an exposé, it was also to a large extent personal memoirs (p. 419). It dealt with a young journalist's efforts to have an investigative article published in a newspaper.

By coincidence, prior to publication of the article, Cowles read a galley or page proof. Cowles does not maintain any direct supervision over the editorial content of *Harper's Magazine*. However, when in New York in September of 1972, at the offices of the Magazine, he asked Shnayerson what would be in the upcoming issue. Among the things mentioned was the article in question. Cowles was interested because he knew the publisher of the Gary Post-Tribune, Walter Ridder, personally. He asked for a copy of the article which he read at his hotel that evening and thereafter telephone Shnayerson with one or two minor comments relative to dates and clarity of exposition of certain figures (Cowles deposition, pp. 10–13).

Barnard, whose function as publisher of the Magazine had to do entirely with the business side of the operation did not see the article until after it was printed (Barnard deposition, pp. 173, 174).[5]

After the article had been edited and was approved by Shnayerson, Aldrich sent a copy of the manuscript to Greenbaum, Wolff & Ernst, the Magazine's counsel for review. Robert Croog, Esq., an attorney associated with Greenbaum, Wolff & Ernst, read the article. Croog then talked to Aldrich about Crile. Aldrich told Croog that he had worked with Crile for some time and that he was honest and trustworthy (Croog deposition, p. 71).[6] Croog then arranged an interview with Crile (Croog at p. 5). Crile came to New York from Washington to

---

5. Hereinafter referred to as "Barnard".

6. Hereinafter referred to as "Croog".

Croog's office and, as Croog had requested, brought with him a quantity of documents and materials which formed the basis for statements made in the article (*Id.* at pp. 5–8). Crile told Croog that the materials he had brought, amounting to a stack three or four inches high (*Id.* at p. 75) were only a portion of the documentation which he had for the statements in the article but, because he had flown to New York from Washington, he had been unable to bring the entire mass of material (*Id.* at p. 11).

Croog questioned Crile "at length" (*Id.* at pp. 21, 22). Croog went through the entire article with Crile and obtained Crile's oral statement of the basis for statements which appeared in the article. Croog reviewed a representative amount of the documents which were shown to him by Crile, substantiating statements Croog questioned (*Id.* at p. 23). Croog did not examine all of the materials that Crile had brought with him. Croog testified that Crile was open with respect to producing any documents Croog asked for in the process of Croog's review of the article (*Id.* at p. 75). He concluded that the article had been thoroughly researched and was accurate. He also concluded, as had Aldrich and Shnayerson, that Crile was honest and reliable and that the statements he made were truthful (*Id.* at pp. 72, 73). He told Aldrich that he was impressed with Crile and had examined documentation (Aldrich, p. 404).

The article, in final revised form, appeared in the November 1972 issue which went to the printer late in September of 1972 and was distributed to subscribers and to newsstands early in October (Barnard, p. 189).

Thereafter, this action was commenced by the plaintiff.

## I

## PLAINTIFF, A PUBLIC OFFICIAL, HAS THE BURDEN OF ESTABLISHING THAT HARPER'S PUBLISHED THE ARTICLE WITH "ACTUAL MALICE"

In the landmark decision of *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct.

710, 11 L.Ed.2d 686 (1964), the Supreme Court held that the constitutional guarantee of freedom of speech and press imposes severe restrictions on the states' libel laws when the allegedly defamatory publications relate to official conduct of an elected official. The Court held that these constitutional guarantees prohibit recovery unless the official "proves that the statement was made with 'actual malice'." *Id.* at 279, 84 S.Ct. at 726.

■ Plaintiff as the elected tax assessor of Calumet Township is indisputably a public official. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); *Rosenblatt v. Baer*, 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966); *Garrison v. Louisiana*, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964); *New York Times Co. v. Sullivan, supra*. This case falls squarely within the reason and scope of the application of this rule.

In *Rosenblatt v. Baer, supra*, the Supreme Court stated:

"The motivating force for the decision in New York Times was twofold. We expressed 'a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide open, *and* that [such debate] may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.' 376 U.S. at 270 [84 S.Ct. 710, at 712, 11 L.Ed.2d at 701, 94 A.L.R.2d 1412.] (Emphasis supplied.) There is, first, a strong interest in debate on public issues, and, second, a strong interest in debate about those persons who are in a position significantly to influence the resolution of those issues. Criticism of government is at the very center of the constitutionally protected area of free discussion. Criticism of those responsible for government operations must be free, lest criticism of government itself be penalized. It is clear, therefore, that the 'public official' designation applies at the very least to those among the heirarchy of government employees who have, or appear to the

public to have, substantial responsibility for or control over the conduct of governmental affairs." *Id.* 383 U.S. at 85, 86 S.Ct. at 675.

In *Gertz v. Robert Welch, Inc.,* supra, the Supreme Court, drawing a distinction between private and public defamation of plaintiffs, reiterated in part the rationale for the *New York Times* rule as to public officials:

"An individual who decides to seek governmental office must accept certain necessary consequences of that involvement in public affairs. He runs the risk of closer public scrutiny than might otherwise be the case. And society's interest in the officers of government is not strictly limited to the formal discharge of official duties. As the Court pointed out in *Garrison v. Louisiana,* 379 U.S. at 77, [85 S.Ct. 209, at 217] the public's interest extends to 'anything which might touch on an official's fitness for office . . . Few personal attributes are more germane to fitness for office than dishonesty, malfeasance, or improper motivation, even though these characteristics may also affect the official's private character.'" *Id.,* 418 U.S. at 344, 94 S.Ct. at 3009.

The issue of taxes is, of course, an issue of intense public concern. How the tax assessor operates in carrying out his public trust is an area requiring the widest constitutional protection of free debate.

In order to meet the requirement of "actual malice" under the constitutional standard established by the Supreme Court in *New York Times Co. v. Sullivan* and its progeny, the plaintiff must produce:

" . . . clear and convincing proof that the defamatory falsehood was made with knowledge of its falsity or with reckless disregard for the truth." *Gertz v. Robert Welch, Inc.,* supra, at 342, 94 S.Ct. at 3008.

The plaintiff has the burden of proving that the defendants published "with a high degree of awareness of probable falsity" (*Garrison v. Louisiana, supra,* 379 U.S. at 74, 85 S.Ct. 209). In *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968) the Court stated:

"[R]eckless conduct is not measured by whether a reasonably prudent man would have published or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. . . . "

Thus, in order to prevail in this case, the plaintiff must establish that Harper's either knew that allegedly defamatory statements in the article were false, had a high degree of awareness of their probable falsity, or entertained serious doubts as to the truth of the statements.

As is demonstrated in the memorandum submitted in support of Crile's motion for summary judgment, many of the statements complained of are not false, many do not refer to the plaintiff and, in any event, none of them were made by Crile with "actual malice."

Harper's, which relied on Crile, not only had no knowledge that any statement in the article was false; it is clear that Harper's did not entertain doubts respecting the truth of any statement, and had no awareness whatsoever of probable falsity of any part of the article.

On the contrary, Aldrich and Croog, after examining the bases for Crile's statements in the article, were satisfied that statements were true and were convinced that Crile was a reliable and truthful reporter. They were made aware by Crile of the fact that he had extensive documentary evidence, tape recordings and notes of interviews with knowledgable sources, and broad information upon which the article was based. Indeed, in retrospect, as is shown in the eight volumes of documents submitted with the Crile motion for summary judgment, as well as the extensive information provided in the interrogatories and the depositions, the reliance of Harper's on Crile was well placed.

As shown above, Aldrich questioned Crile about the bases for the statements in the

article over the course of many meetings and discussions. When Croog queried Crile at length with respect to the article he was shown documents and was told of the other extensive documentary and back-up materials which Crile had. Croog relied on that, as did Aldrich and Shnayerson, as well as on their confidence in Crile's honesty and ability. That back-up material exists and existed at the time and is now before the Court.

Thus, Harper's meticulously explored with the author the background for his statements and the Editor, the Editor-in-chief and counsel all separately concluded that the author was reliable and trustworthy.[7]

Harper's lack of "actual malice", indeed, its belief in the accuracy of the article, is well established by the record and by the legitimacy of the sources of information it believed Crile was relying upon. See *Trails West v. Wolff*, 32 N.Y.2d 207, 344 N.Y.S.2d 863, 298 N.E.2d 52 (1973) (reliance upon Department of Transportation report held proper despite plaintiff's objections before publication); *Time, Inc. v. McLaney*, 406 F.2d 565 (5th Cir.) cert. denied, 395 U.S. 922, 89 S.Ct. 1776, 23 L.Ed.2d 239 (1969) (reliance upon employee of the Department of Justice); *Cardillo v. Doubleday and Company, Inc.*, 366 F.Supp. 92 (S.D.N.Y.1973).

■ Harper's has no independent investigative staff and thus made no independent investigation of the facts. It was not required to do so.

In *Beckley Newspaper Corp. v. Hanks*, 389 U.S. 81, 88 S.Ct. 197, 19 L.Ed.2d 248 (1967), a clerk of the court had recovered a judgment where an editorial had stated that "perhaps his blustering threats were able to intimidate" the president of the

County Board of Health. The alleged participants denied the alleged threat and on cross-examination the newspaper's president stated "you don't have to make an investigation" before making such charges about a well-known public figure since there was cause to "feel" there was the "possibility" of a threat. The Supreme Court held that "it cannot be said on this record that any failure of petitioner to make a prior investigation constituted proof sufficient to present a jury question . . . ." *Id.* at 84, 85, 88 S.Ct. at 200.

Similarly, in *St. Amant v. Thompson, supra*, the court held "Failure to investigate does not in itself establish bad faith." *Id.*, 390 U.S. at 733, 88 S.Ct. at 1326. See, also, *New York Times Co. v. Sullivan, supra; Curtis Publishing Co. v. Butts*, 388 U.S. 130, 155, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967); *Dacey v. Florida Bar, Inc.*, 427 F.2d 1292 (5th Cir. 1970); *Alpine Construction Co. v. DeMaris*, 358 F.Supp. 422 (N.D.Ill.1973) (a statement in an article which had been retracted was relied upon yet the Court stated: " . . . it is apparent that while more thoroughness might be desirable and would have caught the subsequent retraction, 'failure to do so does not result in reckless conduct unless the defendant entertained serious doubts as to the truth of the publication'." *Id.* at 424; *Kent v. Pittsburgh Press Co.*, 349 F.Supp. 622 (W.D.Pa. 1972)).

■ Even an author whose function is to gather facts need not necessarily verify his information. As stated in *New York Times Co. v. Connor*, 365 F.2d 567, 576 (5th Cir. 1966):

"While verification of the facts remains an important reporting standard, a reporter, without a 'high degree of aware-

---

7. There was nothing in the article which was in any way "so inherently improbable that only a reckless man would have put them into circulation" (*St. Amant v. Thompson, supra*, at 732, 88 S.Ct. at 1326). This is particularly so when considered in context of the subject matter of the article and general knowledge about inquiries into Gary at that time. *Cf. Bostic v. True Detective Magazine Co.*, 363 F.Supp. 919 (S.D. N.Y.1973). This Court can take judicial notice

of stories uncovered in recent years by investigative reporting which might well not have been published if the press had not been prepared to expose official wrongdoing in the interest of "uninhibited, robust and wide open" discussion of public officials and matters of public concern. These publishers did not self censor themselves because of fear that some plaintiff might later allege that these revelations were "inherently improbable."

ness of their probable falsity' may rely on statements made by a single source even though they reflect only one side of the story without fear of libel prosecution by a public official."

In *Connor* the author was a staff member of the New York Times and the New York Times has a very large staff of reporters who can do investigatory work. Here Crile was an independent author and Harper had no such staff available.

Similarly, in *Arizona Biochemical Company v. Hearst Corporation*, 302 F.Supp. 412, 418 (S.D.N.Y.1969), the plaintiff argued that "Metromedia's investigation was so 'slipshod and sketchy' . . . as to constitute the reckless conduct required by the *Times* case." The court concluded that "This misses the point. In order to satisfy the New York Times standard plaintiff must charge a doubting state of mind on the part of the defendant." See also *Otepka v. New York Times Co.*, 379 F.Supp. 541, 544 (D.Md.1973).

## II

### ON THIS RECORD PLAINTIFF CANNOT ESTABLISH "ACTUAL MALICE" ON THE PART OF HARPER'S

█ Following the decision of *New York Times Co. v. Sullivan, supra,* it has been established that summary judgment is a singularly important factor in the protection of freedom of the press from libel suits. The "chilling effect" of a libel suit on First Amendment rights calls for a judicial attitude more favorable to summary judgment than in ordinary case, where prevailing attitudes generally disfavor the liberal use of summary judgment dispositions. Thus, in *Bon Air Hotel, Inc. v. Time, Inc.*, 426 F.2d 858, 865 (5th Cir. 1970), the court noted that, where *Times v. Sullivan* applies, "summary judgment, rather than trial on the merits, is a proper vehicle for affording constitutional protection in the proper case."

It is worth pointing out that the length of the record in this case and the plethora of motions made by the plaintiff in itself demonstrates the magnitude of the "chilling effect" which the *Times v. Sullivan* rule is designed to prevent. The expense of the defendants incurred in this matter over a period of, at this point, almost four years has already been of a scope which tends to have a "chilling effect" on the exercise of First Amendment rights which the rule of the *Times* case is intended to protect. To require the defendants to incur the further expense of a trial in this matter, where on this record there is no proof of "actual malice" on their part, would be wholly contrary to the command of the *Times v. Sullivan* principle.

█ It is in order to prevent the "chilling effect" of such burdens on the press, and to facilitate free debate on issues of public concern that the courts have more and more taken the position that the First Amendment issues which arise out of libel suits should be disposed of on summary judgment where a public official plaintiff has failed to establish "actual malice". It is not enough for the plaintiff to allege that a defamatory falsehood has been published, or that the defendant acted carelessly.

In *Washington Post Co. v. Keogh*, 125 U.S.App.D.C. 32, 365 F.2d 965, 967–968 (1966), cert. denied 385 U.S. 1011, 87 S.Ct. 708, 17 L.Ed.2d 548 (1967), the court stated:

" . . . That state of mind should generally be a jury issue does not mean it should always be so in all contexts, especially where the issue is recklessness, which is ordinarily inferred from objective facts. Summary judgment serves important functions which would be left undone if courts too restrictively viewed their power. Chief among these are avoidance of long and expensive litigation productive of nothing, and curbing the danger that the threat of such litigation will be used to harass or to coerce a settlement . . .

In the First Amendment area, summary procedures are even more essential. For the stake here, if harassment succeeds, is free debate. One of the purposes of the Times principle, in addition to protecting persons from being cast in damages in

libel suits filed by public officials, is to prevent persons from being discouraged in the full and free exercise of their First Amendment rights with respect to the conduct of their government. The threat of being put to the defense of a lawsuit brought by a public official may be as chilling to the exercise of First Amendment freedoms as fear of the outcome of the lawsuit itself especially to advocates of unpopular causes."

See also, *Time, Inc. v. McLaney, supra; Cardillo v. Doubleday and Company, Inc., supra.*

The appropriateness of summary judgment in such cases is also apparent from the *Times v. Sullivan* requirement that evidence of "actual malice" be of "convincing clarity." See, *United Medical Laboratories v. Columbia Broadcasting System*, 404 F.2d 706, 712 (9th Cir. 1968), cert. denied, 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969); *Wasserman v. Time, Inc.*, 138 U.S. App.D.C. 7, 424 F.2d 920, 922 cert. denied 398 U.S. 940, 90 S.Ct. 1844, 26 L.Ed.2d 273 (1970).

■ "Actual malice" may not be "presumed", but is a matter of proof by the plaintiff, *New York Times v. Connor, supra; Time, Inc. v. McLaney, supra.* Absent proof with "convincing clarity" summary judgment must be granted to the defendants.[8]

The Court has before it on this motion lengthy depositions of all the concerned parties and many witnesses, extensive documentary evidence contained in the eight volumes submitted in support of the Crile motion, and the answers to extensive and detailed interrogatories. There is no proof of "actual malice" on the part of Harper's. As was said in *Wasserman v. Time, supra* at 922:

"Unless the Court finds, on the basis of pre-trial affidavits, depositions and other documentary evidence that the plaintiff can prove actual malice in the *Times*

sense, it should grant summary judgment for the defendant."

*Goldman v. Time, Inc., supra; Alpine Construction Co. v. DeMaris, supra; Kent v. Pittsburgh Press Co., supra; Meeropol v. Nizer*, 381 F.Supp. 29 (S.D.N.Y.1974); *Otepka v. New York Times Co., supra.*

That there may have been factual errors in the article, such as the information with respect to the Gary Post-Tribune's assessment, is immaterial. It is clear that Harper's was totally unaware of those factual errors (as indeed was Crile).

The recent case of *AAFCO Heating and Air Conditioning Co. v. Northwest Publications*, Ind.App., 321 N.E.2d 580 (1974), is an apt statement of the law. The court said:

"The publisher who maintains a standard of care designed to avoid knowing or reckless falsehood must be accorded sufficient assurance that those factual errors which nonetheless occur will not expose him to indeterminate liability. If a genuine issue of material fact concerning a publisher's reckless disregard for the truth could be raised by a mere showing that the published speech was factually incorrect, the constitutional policy of avoiding media self-censorship would be seriously eroded." *Id.* at 591

Plaintiff has utterly failed to raise a genuine issue of fact as to Harper's having "in fact entertained serious doubts as to the truth" of the article. *St. Amant v. Thompson, supra.* Indeed, it is abundantly apparent that the depositions, documentary evidence, and interrogatories demonstrate that the plaintiff *cannot* prove actual malice in the *Time* sense and, therefore, the Court should grant summary judgment for the defendants.

In *Carson v. Allied News Co.*, 529 F.2d 206 (7th Cir. 1976), the Seventh Circuit adopted the concurring opinion of Judge Wright in *Wasserman v. Time*, 138 U.S. App.D.C. 7, 424 F.2d 920, 922–23 (1970), as a standard for deciding summary judgment motions in cases such as this. In that opin-

---

**8.** Reliance upon the hope that cross-examination will raise a credibility issue on malice "is simply insufficient." *Goldman v. Time, Inc.*, 336 F.Supp. 133 (N.D.Cal.1971).

ion Judge Wright stated, in a passage approved by the Seventh Circuit:

> "Unless the court finds, on the basis of pretrial affidavits, depositions and other documentary evidence that the plaintiff can prove actual malice in the *Times* sense it should grant summary judgment for the defendant."

In this case, based upon the evidence, it is abundantly clear that Fadell cannot prove actual malice "in the *Times* sense."

In *Carson* the concern was the private life of a television celebrity. Here we are concerned with the *public* conduct of an elected public official. It is hard to find a more classical application of full blown First Amendment values as enunciated in *New York Times v. Sullivan.*

The last word from our Court of Appeals for this Circuit is squarely on point and is highly relevant both as to reasoning and result. See *Grzelak v. Calumet Publishing Co., Inc.,* 543 F.2d 579 (7th Cir. 1975). In it Senior Judge Grant of this Court, speaking for that Court, said:

> "The principle espoused in the landmark case of *New York Times Co. v. Sullivan, supra,* simply stated, is that a public official is prohibited from recovering damages for a defamatory falsehood relating to his official conduct unless he proves 'actual malice'—that the statement was made with knowledge of its falsity or with reckless disregard of whether it was true or false. The concept of recklessness, as it is used to define *New York Times* malice, requires that the publisher act with a 'high degree of awareness of . . . probable falsity' in printing the subject matter in question. *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 3003, 41 L.Ed.2d 789 (1974); *Garrison v. Louisiana,* 379 U.S. 64, 74, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964). It is clear that 'mere proof of failure to investigate, without more, cannot establish reckless disregard for the truth.' *Gertz, supra* [418 U.S. 323], 94 S.Ct. at 3003; *Beckley Newspaper Corp. v. Hanks,* 389 U.S. 81, 84–85, 88 S.Ct. 197, 19 L.Ed.2d 248 (1967). Rather, the defendant must, in fact, en-

tertain serious doubts as to the truth of the publication to be guilty of recklessness. *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968).

> The burden of proving actual malice on the part of the defendant, which is undoubtedly a very difficult and demanding burden, must be shouldered entirely by the plaintiff. Such a stringent burden results from the deep-rooted belief that 'speech concerning public affairs is more than self-expression; it is the essence of self-government." *Garrison, supra,* 379 U.S. at 74–75, 85 S.Ct. [209] at 216. Indeed, this heavy burden which is placed upon plaintiffs—and which appellant must sustain in the present appeal—is designed to minimize the 'chilling effect' that libel suits invariably have on the exercise of First Amendment rights by publishers, *Time, Inc. v. McLaney,* 406 F.2d 565, 566 (5th Cir. 1969), and, as counsel for appellee noted during oral argument on appeal, 'to prevent persons from being discouraged in the full and free exercise of their First Amendment rights. . . .' *Washington Post Company v. Koegh,* 125 U.S.App.D.C. 32, 365 F.2d 965, 968 (1966). The initial question for this Court to determine on appeal is whether the pleadings and affidavits show that the material facts about which there can be no genuine issue entitle defendant to judgment as a matter of law.

> "First of all, we find merit in, and are persuaded by appellee's contention that appellant in this case occupied a public position and that the matter of her political appointment was a subject of public or general interest. Even if it could be argued, however, that in the present circumstances appellant was not a public figure about whom considered editorial comment would be allowed, we are not in doubt that the fact that she was a political patronage employee presents an issue about which the public at large undoubtedly has a genuine interest and concern. *Rosenbloom v. Metromedia,* 403 U.S. 29, 44–45, 91 S.Ct. 1811, 29 L.Ed.2d 296

(1971). Given such circumstances then, any statement which appellee published concerning appellant must have been made with actual malice for an action in libel to prevail."

This Court has carefully reviewed a memorandum of plaintiff consisting of 234 pages together with extended volumes of 133 attachments. It would normally be assumed that in such a volume there would be some contention to prevent the entry of summary judgment. However, a careful review of these reflects no actual malice whatsoever as that term is contemplated in *New York Times v. Sullivan* and its progeny.

Therefore, summary judgment is now authorized and GRANTED in favor of all defendants in this case.